# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs February 18, 2004

# IN RE THE ESTATE OF CLARICE LEE MILLER

### An Appeal from the Probate Court for Davidson County
### No. 02P-726     Frank G. Clement, Jr., Judge

---

### No. M2003-01241-COA-R3-CV - Filed June 22, 2004

---

This case involves the rights of a survivor in a joint bank account. During her lifetime, the decedent sold certain real property, put the proceeds in a separate bank account, and executed a will leaving half of the proceeds to her niece. The bank account in which the proceeds were deposited was a joint account between the decedent and her brother. The brother had power of attorney over the decedent's affairs and was the named executor in the her will. After the decedent died, the decedent's will was admitted to probate. The brother, as executor, filed a petition asking for instructions as to the proper disposition of the money in the joint bank account. The trial court held that, when the funds were placed in the joint bank account, the bequest to the niece was adeemed and the funds were no longer a part of the decedent's estate. Therefore, the trial court determined that the brother, as the joint account holder with a right of survivorship, was entitled to all of the proceeds. The named beneficiary now appeals. We reverse, concluding that the evidence preponderates against a finding that the bank account was a joint tenancy with a right of survivorship.

### Tenn. R. Civ. P. 3 Appeal as of Right; Judgment of the Circuit Court is
### Reversed and Remanded

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

Thomas A. Storey, Nashville, Tennessee, for the appellants, Shirley Petty and Mrs. Percy (Judy) Miller.

Ronald K. Nevin, Nashville, Tennessee, for the appellee, Cecil Miller, Executor of the Estate of Clarice Lee Miller.

**OPINION**

On December 22, 1972, Percy Miller ("Percy") and his wife, Judy Miller ("Judy"), purchased a half interest in residential property located at 168 Chippendale Drive, Hendersonville, Tennessee. The other half interest was purchased by J. C. McMurty ("McMurty"). McMurty moved into the house with Percy's older sister, Clarice Lee Miller ("Clarice"), the decedent in this action.[1]

Clarice was the oldest of several children whose father had moved out of their home. After their father left home, Clarice helped take care of the younger children. In an effort to help Clarice in her declining years, in 1980, Percy and Judy gave Clarice a warranty deed for their half interest in the Chippendale Drive property. The transfer was made with the understanding that Clarice would give half of the proceeds from the eventual sale of the house to Percy's daughter by his first marriage, Shirley Petty ("Petty"). In 1985, McMurty gave Clarice the other half interest in the property.

Clarice lived in the house on Chippendale Drive until it became necessary for her to move into a nursing home.[2] In June 2000, Clarice sold the property. The net proceeds from the sale amounted to $82,814.29. At that time, or shortly thereafter, Clarice executed her Last Will and Testament. In accordance with her brother Percy's request, Clarice's will included a specific bequest to Petty of half of the proceeds from the sale of the Chippendale Drive property.[3] Clarice's brother, James O. Miller ("James"), was the named executor in this will. Clarice had also given James a general power of attorney to conduct her business affairs during her lifetime.[4] With that power of attorney, James opened a bank account for Clarice at SunTrust Bank, listing three persons as authorized to sign checks – himself, Clarice, and their brother, Cecil E. Miller ("Cecil"). James deposited the entire proceeds from the sale of the house into the SunTrust account. No other funds were co-mingled with the funds from the sale of the property.

James objected to the will that Clarice had made and became angry at her. Consequently, James withdrew as executor of Clarice's estate. On May 3, 2001, Clarice executed a document giving power of attorney to her other brother, Cecil. According to the power of attorney document, Cecil was authorized to do the following:

> sign checks in [her] stead and transact all banking business for [her] . . . and to do, execute and perform all and every other act or acts,

---

[1]McMurty and Clarice never married.

[2]The record does not indicate exactly when Clarice moved to the nursing home.

[3]A copy of that will was not included in the record on appeal, but its existence and the fact that it included a bequest to Petty is not in dispute.

[4]A copy of the power of attorney was not included in the record on appeal, but the fact that it existed is not in dispute.

thing or things, in law needful and necessary to be done in and about the premises, as fully, completely, and amply, to all intents and purposes whatsoever as [she] might do if acting personally.

Thus, the power of attorney authorized Cecil to transact business in accordance with Clarice's intentions.

A week later, on May 10, 2001, Clarice executed a new Last Will and Testament appointing Cecil as the executor. Like the first will, the second will included a specific bequest to Petty of half of the funds from the sale of the Chippendale Drive property. The bequest in Clarice's will read:

I desire that one half of the proceeds from the sale of real estate located at 168 Chippendale Drive, Hendersonville, Tennessee go to Shirley Petty, the daughter of my deceased brother Percy Miller, as requested by him. The net proceeds amounted to $82,814.29; the amount to go to Shirley Petty is $41,407.15.

The next day, on May 11, 2001, Cecil closed the first account at SunTrust for which he, James, and Clarice had been authorized signatories. Cecil then opened a second joint bank account, this time with only Cecil and Clarice being authorized signatories.

On March 25, 2002, Clarice died at ninety-one years of age. Soon thereafter, Cecil closed the SunTrust account and took the proceeds as the surviving joint account holder.

On April 23, 2002, Cecil filed a small estate affidavit in the probate court, listing Clarice's assets and stating that her personal estate was valued at $7,231.34. The affidavit did not include the monies in the joint SunTrust account. In May 2002, the trial court converted the small estate over to a full administration, and Clarice's will was admitted to probate. In accordance with the terms of Clarice's will, Cecil was appointed as executor of her estate. A later accounting revealed that Clarice had $35,484.26 in another bank account at Region's Bank.

On July 12, 2002, Cecil filed a petition for construction of the will, seeking direction as to the proper administration of the $41,407.15 bequest to Petty. The petition pointed out that the proceeds from the sale of the Chippendale Drive property were "placed into a joint checking account at SunTrust Bank prior to the execution of the will and remained in a joint account in the names of Clarice L. Miller and Cecil Miller at the time of the death of the testator."

On July 19, 2002, Cecil's deposition was taken. Cecil testified that, in May 2001, Clarice had given him power of attorney over her business affairs, and that he used it only to deposit or withdraw funds from her second SunTrust account for which he and Clarice were signatories. Cecil said that, although Clarice was mentally alert, she was not physically capable of going to the bank herself. Cecil admitted that the funds in the account were "all her money," and that when Clarice died, the account had in it at least the $82,814.29 in proceeds from the sale of the Chippendale Drive

property. Cecil asserted that Clarice did not put the money in the account with the intent of maintaining it to pay Petty the bequest in the will. Rather, he maintained that Clarice intended for the money to go to him. Cecil acknowledged that, in Clarice's will, he was listed only as one of many beneficiaries who were to receive a share of the remainder estate. Contrary to the clear language in Clarice's will, Cecil testified that Clarice had told him many times that the money in the SunTrust account was his money.

On March 17, 2003, Petty and Percy's wife Judy (collectively, "respondents") filed a joint response to Cecil's petition, asserting that Clarice "clearly intended that one-half of the sale of the Chippendale Drive Property go to Shirley Petty with the remainder becoming part of her estate." They claimed that Cecil exerted undue influence over Clarice to induce her to create a joint checking account with a right of survivorship to him. They maintained that there was no evidence that Clarice intended to give such a substantial part of her estate to Cecil alone; to the contrary, Clarice gave her power of attorney to Cecil to act on her behalf to carry out her intentions, which were stated expressly in her Last Will and Testament. Therefore, they asserted, if Cecil took any action contrary to the intention set forth in Clarice's will, he exerted undue influence over her or acted without her knowledge. Thus, the respondents requested that the trial court include the proceeds in the SunTrust account in Clarice's estate and have Cecil pay Petty the amount devised to her according to Clarice's will.

On March 28, 2003, Cecil filed a pleading asserting that, by placing the proceeds of the sale of the Chippendale Drive property in a joint bank account, Clarice adeemed her specific bequest. In other words, when Clarice and her brothers opened the joint checking account, the money was no longer owned solely by Clarice. The joint account was still in existence on May 10, 2001, when Clarice executed her second will. Cecil argued that the provision in Clarice's will leaving half of the proceeds from the sale of the Chippendale Drive property to Petty was inoperative based on the rule of ademption by extinction, because her disposition of the money interfered with the operation of the will. Cecil maintained that the rule of ademption by extinction would prevail without regard to the intention of the testator, because it is predicated upon the principle that the subject of the gift is annihilated and its condition so altered that nothing remains to which the terms of the bequest can apply.

On April 1, 2003, the trial court held a hearing on the matter.[5] On April 21, 2003, the trial court entered an order holding that an ademption had occurred and that, consequently, there was no fund out of which to pay Petty her bequest under Clarice's will. In reaching that conclusion, the trial court reasoned:

> [T]he proceeds of the sale of real estate bequeathed to Shirley Petty
> in Item II of the decedent's Last Will and Testament was adeemed
> and therefore there are no funds from the sale of the real property
> available for distribution to Shirley Petty, that the decedent had

---

[5]There is no transcript of the hearing in the record on appeal.

> entered into contracts with SunTrust Bank to create joint accounts
> with rights of survivorship, that no Power of Attorney was used by
> the joint account holders for the creation of the joint accounts and that
> the contract with the bank prevails over the will.

Thus, the trial court concluded that the contracts with SunTrust Bank created rights of survivorship in the joint account holders, and that those contracts prevailed over the terms of the will. From that order, the respondents now appeal.

On appeal, the respondents argue that the trial court erred in determining that the bequest to Petty of the proceeds from the sale of the Chippendale Drive property was adeemed when Clarice opened the joint checking account with Cecil. The respondents assert that Clarice did not intend to give Cecil a right of survivorship in the proceeds of the sale of the property. Therefore, they argue, by opening the joint checking account with a right of survivorship, Cecil acted contrary to Clarice's intent and took advantage of the fact that she was physically unable to go to the bank to handle her own affairs. Clarice's intentions were made clear in her Last Will and Testament, and there is no evidence that she ever intended to give such a large sum of money to either of her brothers. If James' and Cecil's signatures were included on the signature cards of either of the accounts, the respondents argue, they should have been included only in a representative capacity with no rights of survivorship. In the alternative, if there was a contract to create a right of survivorship, the Respondents argue that Cecil engaged in undue influence, overreaching, or fraud.

We review the trial court's decision *de novo* on the record, with a presumption that the trial court's findings of fact are correct, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). We review the trial court's conclusions of law *de novo*, with no presumption of correctness. *Atkins v. Clark*, 59 S.W.3d 124, 126-27 (Tenn. Ct. App. 2001). Whether a bequest has been adeemed by extinction is a question of law, which we review *de novo*. *In re Estate of Hume (The University of the South v. Klank)*, 984 S.W.2d 602, 604 Tenn. 1999).

"[A]demption is generally defined as the extinction, alienation, withdrawal, or satisfaction of the legacy by some act of the testator by which an intention to revoke is indicated: the doing of some act with regard to the subject-matter which interferes with the operation of the will." *Id.* (quotation omitted). Ademption of a bequest can occur by satisfaction or by extinction. Ademption by satisfaction occurs when the subject matter of the bequest has been withdrawn from the will by the testator, giving in his lifetime to a beneficiary the thing he had devised in the will. In such a situation, the testator's intent is critical. *Rhodes v. Kebke*, 167 S.W.2d 345, 348 (Tenn. 1947). Ademption by extinction occurs, however, when the disposition of property bequeathed in the will during the testator's lifetime interferes with the ability to carry out the terms of the will; it occurs without regard to the intent of the testator. *In re Hume*, 984 S.W.2d at 604; *Akins*, 59 S.W.3d at 127. Therefore, as discussed below, the trial court must necessarily have determined that the funds bequeathed to Petty passed directly to Cecil at Clarice's death based on the "contract with the bank," and that Cecil was entitled to those funds as the joint account holder with a right of survivorship.

The landmark case of *Lowry v. Lowry*, 541 S.W.2d 128, 131 (Tenn. 1976), addressed at length the rights of parties to a joint bank account. In that case, the petitioner was the son of the decedent. The son held with the decedent two joint savings accounts totaling $28,000. The issue presented was whether the funds in the joint accounts should have been transferred directly to the petitioner son, or whether the funds should have been divided equally among the decedent's five children under her will. *Lowry*, 541 S.W.2d at 129. The other children of the decedent argued that the petitioner was required to show affirmatively that the funds were transferred to him as a gift, under the general law of gifts. The Tennessee Supreme Court rejected the "gift" theory in favor of a "contract" theory. *Id.* at 130-31. Under the "contract" theory, the right of survivorship may be created in a joint bank account by the execution of a contract stating such terms, and clear language on a bank signature card is sufficient evidence of such a contract. The *Lowry* Court stated:

> Absent clear and convincing evidence of contrary intent expressed at the time of its execution, we hold that a bank signature card containing an agreement in clear and unambiguous language that a joint account with rights of survivorship is intended, creates a joint tenancy enforceable according to its terms; and upon the death of one of the joint tenants, the proceeds pass to the survivor.

*Id.* at 132. Thus, under *Lowry*, rights of survivorship can be established by submitting evidence of an express contract doing so. The contract is between the depositor and the bank. *See Chambers v. Henry*, 628 S.W.2d 740, 742 (Tenn. Ct. App. 1981). Such a contract creates a rebuttable presumption that the parties signing the contract intended for each party to have a right of survivorship in the joint account. *See Clark v. Brown*, 656 S.W.2d 4, 8 (Tenn. Ct. App. 1983). The presumption can be rebutted by clear and convincing evidence of a contrary intent at the time of the execution of the contract, or by proof of fraud, undue influence, or overreaching. *Id.* Subsequent cases have held that, absent an express contractual provision, the intent to establish rights of survivorship in a joint bank account can also be proven by extrinsic evidence. *Gay v. Phillips*, 667 S.W.2d 495, 497 (Tenn. Ct. App. 1983); *Merchants Planters Bank v. Myers*, 644 S.W.3d 683, 689-90 (Tenn. Ct. App. 1982); *see Simmons v. Foster*, 622 S.W.2d 838, 842 (Tenn. Ct. App. 1981).

In the instant case, the signature card signed by Clarice and Cecil establishes a joint account, but contains no language creating rights of survivorship. Furthermore, the record includes no other documentary evidence that Clarice entered into an express contract with the bank to create a right of survivorship in the account at issue. *See In re Estate of Bowlin (Bowlin v. Abels)*, 766 S.W.2d 193, 195 (Tenn. Ct. App. 1988) (holding that, where the deceased failed to contract with the bank to create a right of survivorship in the joint owner, certificate of deposit was an asset of the estate); *Simmons*, 622 S.W.2d at 842 ("The crucial question, then, is whether an agreement existed between the bank and the decedent to make the joint accounts joint tenancies with the right of survivorship . . . .").

The only evidence on which Cecil can rely to establish a right of survivorship in the joint bank account is his own uncorroborated testimony:

> Q. Did Clarice Miller set up that account or have that account set up at SunTrust for the purpose of paying Shirley Petty the money that she was due under Item II in Ms. Miller's will?
>
> A. No, she did not.
>
> Q. Why did she open a separate account when she had a bank account at another place?
>
> A. She opened this account as a joint account to go to her two brothers, James Olney Miller and me, and she was the third one. She said this was not to be used for any other purpose.
>
> * * *
>
> Q. Did Ms. Clarice Miller have any idea that you were going to claim this bank account that you set up in her name with her?
>
> A. Yes, she did. She knew I would. She told me many times, "That is your money."

In *Simmons v. Foster*, 622 S.W.2d 838 (Tenn. Ct. App. 1981), the appellate court held that the contract necessary to create a joint account with the right of survivorship may be proved by oral testimony. *Simmons*, 622 S.W.2d at 842. At issue in that case were a joint checking account and a joint savings account, both in the joint names of the decedent, Mr. Simmons, and his cousin, Mrs. Cowden, with whom the decedent lived toward the end of his life. The decedent Simmons opened a joint checking account in the name of Simmons or Cowden. There was no signature card on file for the joint checking account. Years later, the decedent Simmons opened a joint savings account in the name of Simmons and Cowden. Although there was no signature card for this account either, Simmons told the bank officer when he opened the savings account that he wanted Cowden to have the funds if anything happened to him. *Id.* at 839. The *Simmons* court indicated that, because there was no written contract specifically creating a right of survivorship, the issue was whether there was any other evidence of a right of survivorship in either of the joint accounts. *Id.* at 841.

The *Simmons* court noted that, in contrast to *Lowry, supra*, there was no bank signature card for either the joint checking account or the joint savings account, and stated that Cowden was required to show by other evidence that there was an agreement between the bank and the decedent to make the joint accounts joint tenancies with a right of survivorship in Cowden. *Id.* at 841-842.

-7-

The *Simmons* court held that such an agreement between the bank and the decedent could be proved by "oral testimony." *Id.* at 842. Analyzing the evidence, the *Simmons* court reached differing conclusions on the joint savings account and the joint checking account:

> In the instant case . . . the testimony establishes such a contract [between the bank and the decedent to create a joint account with a right of survivorship] with respect to the joint savings account. We think it is clear that the depositor, Mr. Simmons, intended for Mrs. Cowden to receive the balance in the account at his death and so instructed the bank at the time he opened the account. Therefore, the right to receive the funds in the joint savings account passed to Mrs. Cowden at Mr. Simmons' death.
>
> With respect to the joint checking account, there is no evidence in the record of such an agreement between the bank and Mr. Simmons. Nor is there any evidence to prove any of the other theories by which the right of survivorship may be established. Therefore, we hold that there was no right of survivorship created and that the executor is entitled to the funds in that account.

*Id.*

In this case, as in *Simmons*, there is no documentary evidence, such as a signature card, indicating that there was an agreement between Clarice and the bank to make the joint account a joint tenancy with a right of survivorship. Unlike the joint savings account in *Simmons*, however, there is no oral testimony of such an agreement. There is only Cecil's testimony that Clarice opened the joint account "to go to her two brothers, James Olney Miller and me, and she was the third one." Cecil asserted that in reference to the joint account, Clarice told him, "That is your money." Such vague uncorroborated testimony of statements purportedly made by the decedent to Cecil at an unspecified time is insufficient to establish an agreement between SunTrust Bank and Clarice to create a joint tenancy with a right of survivorship. This is particularly true in light of the other evidence in the record indicating that Clarice fully intended that half of the proceeds from the sale of the Chippendale Drive property be given to Petty at her death. Clarice kept the proceeds from the sale in a separate account from the time of the sale until her death. On May 3, 2002, she gave Cecil power of attorney over her banking affairs, and within one week opened a joint bank account in which she deposited the sale proceeds. In the same week, she executed a second will naming Cecil as executor and leaving Petty half of the proceeds from the sale of the property. Under all of these circumstances, we must conclude that the evidence in the record is insufficient to find that the joint account was a joint tenancy with right of survivorship.

Therefore, we must analyze Cecil's rights as a joint tenant with no right of survivorship. Joint tenants without a right of survivorship are presumed to have an equal interest in the funds in the joint bank account. *See In re Estate of Williams (Williams v. Clyce)*, 1989 WL 22754, at \*2

(Tenn. Ct. App. March 17, 1989). In *Williams*, certificates of deposit were issued by a bank and made payable to the decedent and his stepdaughter. *Id.* at *1. The CDs contained no language referring to a right of survivorship, and the testimony appeared to indicate that the stepdaughter's interest in the CDs was merely custodial. *Id.* at *4. Consequently, the *Williams* court analyzed the stepdaughter's right in the CDs as a joint tenancy with no right of survivorship:

> The rule as to tenancies in common is that although it may be presumed that the interests of the co-tenants are equal, this presumption does not apply if there is evidence to the contrary. Evidence of the proportion contributed by each co-tenant is persuasive as to the amount of their respective shares. *See* 20 Am.Jur.2d Cotenancy & Joint Ownership §§ 26, 118. The fact that the [stepdaughter] contributed nothing toward the purchase of the CD's, coupled with evidence that her only interest in the funds was custodial, compels the conclusion that even if a technical tenancy in common resulted, the [stepdaughter's] share was zero. Thus the Estate is entitled to the entire fund.

*Id.* at *4. In this case, Cecil admitted that Clarice was the only depositor in the account, stating that it was "all her money." This evidence compels the conclusion that, even though Cecil and Clarice were joint tenants in the SunTrust account, Cecil's share was zero. *See id.*

Accordingly, we must conclude that the evidence preponderates against the trial court's conclusion that "the decedent had entered into contracts with SunTrust Bank to create joint accounts with right of survivorship" and consequently that "the proceeds of the sale of real estate bequeathed to Shirley Petty in Item II of the decedent's Last Will and Testament was adeemed . . . ." Therefore, this finding is reversed. The record is clear that Cecil had no individual interest in the account and that his interest was merely custodial. Consequently, any funds that were in the SunTrust account at Clarice's death would go to Clarice's estate upon her death. The holding pretermits all other issues raised on appeal. The cause is remanded to the trial court for further proceedings consistent with this opinion.

The decision of the trial court is reversed and remanded to the trial court for further proceedings. Costs on appeal are to be taxed to Appellee Cecil Miller, Executor of the Estate of Clarice Lee Miller, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE