IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
June 22, 2011 Session

IN RE **ESTATE OF VIOLA B. COPAS**

consolidated with

**NORMAN COPAS, ET AL. V. RANDALL COPAS[1]**

**Appeal from the Chancery Court for Washington County**
**No. 8501 & P-42-63-05     G. Richard Johnson, Chancellor**

**No. E2010-00877-COA-R3-CV-FILED-JANUARY 20, 2012**

This appeal concerns whether the son of a decedent breached his fiduciary duty under a power of attorney and as the personal representative of the decedent's estate. The siblings sued their brother, asserting that he used undue influence over their mother in order to unlawfully obtain her funds for his benefit to the exclusion of his mother and her estate. The brother argued that the money was properly used to take care of his mother and to run her farm. The trial court entered a judgment in favor of the siblings for $2,040,276, plus attorney fees totaling $102,576.36, upon finding that the brother failed to meet his burden to rebut, by clear and convincing evidence, the presumption of undue influence. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery and Probate
Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR. and D. MICHAEL SWINEY, JJ., joined.

Thomas A. Peters, Kingsport, Tennessee, for the appellant, Randall Copas.

Arthur M. Fowler and Arthur M. Fowler, III, Johnson City, Tennessee, for the appellees,

---

[1]In a February 18, 2011 order, we determined that these cases arise from the same facts and consolidated them into one appeal.

Norman Copas and Phyllis Pearce.

## OPINION

### I.  BACKGROUND

In 1983, Viola Copas ("Mother") and her husband, Clyde Copas ("Father"), opened the Winding Brook Farm checking account at Hamilton Bank ("Farm Account").[2]  They added  their son, Randall Copas ("RC"), as an authorized signatory on the Farm Account in October 1990.  The account was designated a "Sole Owner" account -- not a "Joint Tenants with Right of Survivorship" account.

On August 13, 1991, Mother executed her Last Will and Testament ("Will").  In Article 1 of the Will, among other assets, Mother identified the Farm Account; she did not relate that RC has any ownership interest in the described assets.  Pursuant to the Will, the real estate was left to RC and the monetary assets were to be divided between Mother's other two children, Norman Copas and Phyllis Pearce ("Siblings").

From 1997 forward, RC had no job except for helping with the farm.  In August of that year, Mother and Father executed unrestricted powers of attorney appointing RC as their attorney-in-fact.  Father subsequently passed away in October 1998.

Prior to Father's death, in March 1998, Mother and her husband borrowed $100,704.51.  According to RC, $20,000 went into the Farm Account.  Siblings assert that RC took $26,657.51 from the net loan proceeds.  RC admits that he took an additional $9,572.22 from the Farm Account in 1998.

A year later, Mother borrowed $159,792.46.  It appears that from the net proceeds, RC took $2,500 in cash and deposited the balance into the Farm Account.  In July 1999, RC, utilizing the power of attorney ("POA"), executed closing documents to sell 0.48 acres of Mother's land to Gray Industrial Development Corporation ("GIDC") for $8,000 ("Sale No. 1").  Again, using the POA, RC subsequently executed the necessary closing documents to sell Lot 1 of the Copas Property Subdivision to GIDC for $65,000 in November 1999 ("Sale No. 2").  RC admits that he took $2,700 cash from the sale proceeds, but claims he deposited $61,523.42 into the Farm Account.  However, shortly after this deposit, RC wrote checks from the  Farm Account payable to cash, his wife, and himself totaling $13,000.  He admits that during 1999, he took an additional $34,920.39 from the Farm Account.

---

[2]SunTrust Bank is the successor of Hamilton Bank.

In March 2000, RC used the POA to sell another 3.794 acres of Mother's land to GIDC ("Sale No. 3") for $320,000. The purchaser paid $104,865 at closing and signed a note for $200,000 to be paid in January 2001. From the $104,865 RC received on March 28, 2000, he admits he took $24,865 and only deposited $80,000 into the Farm Account. RC further acknowledges that he took an additional $19,532.73 from the Farm Account in 2000.

The final payment for Sale No. 3 was received on January 19, 2001, totaling $200,758.08. From this amount, RC deposited $85,000 into the Farm Account, took $15,758.08 in cash or deposited this amount into his personal account, and took $100,000 to open a money market account with right of survivorship at SunTrust Bank ("2001 Money Market Account"). The only other deposits into this account were periodic interest totaling $2,752.39. From the 2001 Money Market account, RC admits that he took or cannot account for $59,199.99. His signature appears on all checks, withdrawal tickets, and cash withdrawals. Ultimately, RC transferred the remaining money to the Farm Account, from which he took an additional $62,679 in 2001.

In March 2002, Mother borrowed $197,235. From this amount, it appears that RC took $14,287.29 from the loan proceeds and deposited $50,000 into the Farm Account. Five months later, Mother executed loan documents to borrow $245,000.[3] Of that amount, $197,563.82 was used to pay off the existing indebtedness. RC took $14,685.85 from the loan proceeds and deposited $30,000 into the Farm Account. According to RC, he took an additional $45,712.22 from the Farm Account in 2002.

In February 2003, Mother executed loan documents to borrow $320,000.[4] From the money received, RC took $20,505.19 and $50,000 went into the Farm Account. Eight months later, Mother sold .0374 acres to GIDC for $37,500 ("Sale No. 4"). From the sales proceeds, RC took $3,500 and deposited $34,000 into the Farm Account.

In March 2004, 2.3089 acres of Mother's land was sold to Commerce Plaza, G.P. for $160,000 ("Sale No. 5"). From the sale proceeds, RC claimed that he took $40,000. After reviewing the records, however, Siblings contend that RC actually took $60,000. The buyer paid $80,000 on March 12, 2004, and RC took $20,000 -- $19,000 into his personal bank account and $1,000 in cash. It appears that buyer overpaid Mother $20,000. RC refunded

---

[3]The loan documents indicate that the farm's total income for 2001 was $174,934. In addition to the farm income, Mother received social security benefits at $8,376 per year and annuity income at $14,958. During 2001, Mother received interest payments from various savings at $2,876.

[4]The loan documents reveal that 38.97 acres had been sold out of the original 156.9 acres, leaving 118.03 acres.

the buyer $10,000 for the alleged overpayment on the purchase price from the Farm Account and not his personal funds. He admits that he took an additional $43,916.77 from the Farm Account in 2004.

In January 2005, six months before Mother's death, RC used the POA to sell 6.92538 acres of Mother's land to Prime Time Properties, G.P. for $652,500 ("Sale No. 6"). Around this time, Mother was in and out of the hospital. Of the $652,500, RC took $82,462.67. Upon receiving the sale proceeds at closing, RC did three things: (1) He revised the Farm Account; (2) He set up another Money Market Account at SunTrust ("2005 Money Market Account") as a right of survivorship account with an initial deposit of $150,000; and (3) He set up the Edward Jones Account with an initial deposit of $150,000 (part of the proceeds from Sale No. 6), with the statements going to his home and not Mother's. RC has asserted that the Edward Jones Account was a right of survivorship account, but Mother never signed the account agreement.

The revision to the Farm Account did not show that the account was a survivorship account because Mother did not mark the account as "With Survivorship." RC admits that he took an additional $84,810.47 from the Farm Account in 2005. He also transferred $40,000 from the Farm Account to the 2005 Money Market Account. At Mother's death, the Farm Account had only $2,262. From the 2005 Money Market Account, RC took $132,806.83. At Mother's death, the account had $135,840. At Mother's death, the Edward Jones Account had $153,484.04. RC took over $132,439.60 from it.

On August 5, 2005, RC petitioned the Probate Court to issue letters testamentary to him. Instead of opening an estate bank account, he used the existing Farm Account for that purpose. While the estate was still open, he added his wife as a signer on the Farm Account. The trial court later determined that Mother had approximately $302,000 in cash in various accounts at the time of her death.

After Siblings became aware of RC's actions and the condition of the estate, they filed a petition to have RC removed as personal representative. A separate lawsuit was filed in Chancery Court seeking declaratory relief against RC. Upon reviewing the record, the trial court found that it could not have a trial until RC provided it with an accounting and inventory for the estate. The trial court also ordered RC to file an accounting regarding all funds to which he had access while he was Mother's attorney-in-fact.

RC filed documents purporting to be accountings on November 10, 2008, to which the Clerk and Master and Siblings thereafter objected. The documents filed by RC included one page from a January 2004 bank statement for the Farm Account and checks written to cash that did not have any notation as for what they were intended. RC did not provide

receipts to support reimbursements, did not provide copies of all cancelled checks, and the document was not sworn to. RC listed only the 2005 Money Market account, Edward Jones Account, and Farm Account in these documents. At a hearing two months later, the court found that RC "avoided and evaded answers to questions, and that his credibility is suspect at best." The trial court ordered RC to "file a sworn accounting that complies with the laws of the State of Tennessee and the Local Rules of this Court and shall be detailed as set forth above in this Order . . . ."

On February 27, 2009, RC filed a second purported inventory and amended accounting. Siblings again objected to the proposed accounting based upon the fact that RC failed to identify the expenses he paid from the accounts. RC's accounting showed numerous withdrawals from the Farm Account (estate account), but only one receipt, which was for Mother's funeral.

Pursuant to their review, Siblings discovered that RC took $628,185.78 in cash from Mother's accounts while he was her attorney-in-fact. Their investigation further revealed that RC could not account for the disbursement of most of the over $2,000,000 to which he had access as Mother's attorney-in-fact. After a hearing on May 19, 2009, the court found RC in willful and purposeful contempt for not filing a proper accounting and not complying with the court's previous orders.

RC subsequently filed his third proposed accounting, to which the Clerk and Master and Siblings objected. Another hearing was conducted on November 10, 2009, nearly 13 months after the trial court originally requested RC to provide an accounting. RC's explanation for his actions was that from 1997 until Mother's death, he had no job other than the farm. According to RC, he received no salary, but they split any income the farm made. He testified as follows:

> [O]ver all these years I took care completely, done the caregiving for both of them. The farm, them, the home, their yard, their garden, helped canning, my wife did or whatever. I want the court to realize that -- that everything that was done I did it. I did it. I'm glad I was able to do it. I did live out of the money, it may have totaled thirty or forty thousand a year, I done everything like it should have been done on this. I done it to the best of my ability. I cared for them, I was there with her, I stayed with her, I bathed her. . . . I done the best that was -- no, they had no idea, Norman or Phyllis either one, my brother and sister here, what we went through to keep the place going or keep it open or just keep the -- keep the property. Yes, we borrowed money, we borrowed it and I took care of them, I told them, I said, "No matter what it took, I would not put her in a nursing home." And I kept my promise to her.

. . . But what I can tell you is I took care of everything that they needed and how I went about it may not have been exactly the way it should have been, but I took care of every need they had, stayed with them and why [Siblings] didn't visit, why they didn't come over to the house when Phyllis lives a mile away . . . .

RC admitted that he took at least $709,420.74 from Mother and her estate.

In the view of Siblings, RC violated the trust Mother placed in him to assist her with the farm. They asserted that RC had taken part of Mother's money from land sales and loans by depositing funds into his personal checking or pocketing funds. They contended that even when funds from land sales and loans were deposited into the Farm Account, RC used that money for his own use. Their witness, Lynn Woolbridge, reviewed RC's filings and determined that RC wrote $123,940 in checks to cash; $69,471.94 to pay his Associates/Citi Bank loan, which Siblings believe was the mortgage for his and his wife's personal house; $5,627.89 for his loan to First Money Store; $10,572.50 for an auto loan to Washington County Bank; $1,819.45 for an additional loan to Washington County Bank; $6,572.64 for his loan to Southern Financial Services; $35,656.89 for his Regency Financial Services loan; $15,527.95 for his loan to Greene County Bank for his daughter's Lexus; $42,857.57 to First Tennessee Bank for his personal loan; $3,362.40 to the U.S. Treasury for his income taxes; $4,921.21 for his loan at Bank of Tennessee for his Mercedes Benz automobile; $6,459.76 for his home and car insurance; and $9,306.03 for his insurance with Lincoln Benefit Life Insurance. RC admitted that he paid his daughter $5,950 from the Farm Account and paid the rent on her condominium in Savannah Shores from it.

Siblings presented further evidence that RC received two personal loans totaling $6,000, but instead of using his own money to repay these loans, he repaid his debts from the Farm Account. In regard to Mother's rental house in Mount Carmel, Hawkins County, Tennessee, RC collected and pocketed all the rental income, but paid the mortgage from the Farm Account. Siblings noted that when RC received a check for $23,955.11 from Farm Credit Services made payable to Mother after her death, he deposited $13,955.11 into his personal account.

After all proof was entered and both sides rested, the trial court ruled as follows:

THE COURT: [T]his is the worst estate and power of attorney case I've seen come through my court. I've been on the bench now about twenty-one years and I have seen some real messes so far as operating an estate account, but I have never seen any that are in this bad a shape. "This bad a shape," I mean accounting-wise. You know, this makes the third time that I've ordered [RC]

to file an accounting of these funds . . . . He never has done that. . . .

. . . [I]n spite of me finding him in contempt and in spite of me doing everything I knew to do in my power, this gentleman, [RC], has never fulfilled my order. Now, he says it's impossible. Wait just a minute, he was in charge of the money, he was supposed to keep the records. He was supposed to keep the receipts. He was supposed to keep the debits. He was supposed to keep the credits and most importantly, he was supposed to keep his money separate from the estate money or from the account money that we have here and he never did do that. The truth of the matter is he's only presented one receipt. Out of all this accounting, one receipt and that was for the funeral.

\* \* \*

The Court finds that [RC] will not file the appropriate accounting that has been asked for at least three times. That [RC] by his failures to provide a complete, accurate accounting leaves many gaps in his use of this account. The evidence is clear that [RC] took $284,928.50 to him personally out of this account. Then he took $424,934.68 out of this account to him and this was part of the split funds deal where he'd do a deal and take some of the money and put it in account and take the other money and put it in his pocket.

The record is clear that [RC] wrote checks to cash and then he cashed them and put the money in his pocket and that sum is $123,940.00. And then we end up with another $29,666.19 in those split deposits again, where he'd take some of the money as we heard from the witness stand, put it in the account and then he'd take the rest of the money and put it in his pocket. The Court finds he's a thief.

The total of [Siblings'] missing money is $863,469.38. I say "missing," that's the money that went to [RC] and he admits the he took $709,420.74 from these accounts. But again, the accounting is incomplete, it's inaccurate and it's not the accounting that is required by law, statutes and the rules of this Court.

The Court notes that [RC]'s use of his power of attorney was abusive and that he used it to profit himself. There was a POD account involved. The SunTrust market -- money market account, that was a POD account to [RC]; however, because [RC] has wrongfully received benefits to himself, paid by himself while serving in the fiduciary capacity of a power of attorney, the Court finds that this account, too, is a part of the estate and is not [RC]'s

-7-

money.

There are two other accounts that [RC] contests about whether or not they are POD accounts. That's the Winding Brook Farm account and the Edward Jones account. An examination of the Court of these documents do not show any intent to give [RC] a right of survivorship. The Court is mindful of Tennessee Code Annotated 45-2-703 creates a presumption that these accounts are sole owner accounts with [RC] having a power of attorney. Because these accounts were not survivorship accounts, they too belong to the estate. The Court finding after reviewing these documents that they are not survivorship or POD accounts.

\* \* \*

. . . [T]he Court finds that it's not only difficult in this case, but it is impossible because of the way that [RC] kept records and -- or failed to keep records, or threw away records, whatever, he doesn't have the records and he co-mingled by his own admission his funds into the funds of -- involving this case. And it's impossible to determine with no accounting what belongs to [RC] and what properly belongs to the account.

In endeavoring to ascertain how much property or money went into a co-mingled mass, and how much was [RC] and how much was the - the other party, every reasonable resolution as to which property is the beneficiary's should be made against [RC] through whose fault the truth in this matter has become obscure. This rule has been followed to where the co-mingling is through the fault of the fiduciary. And in those cases the entire mass of the funds will be treated as fiduciary property or funds that [RC] may be able to distinguish what is his. The Court finds he's unable to distinguish what is his. I know he submitted documents saying what . . . is [his], but those documents are self-serving and serves his interest and I'll get into that in just a minute. In other words, if the co-mingling of the funds was wrongful, then the burden is on the fiduciary to distinguish his funds from the other funds. He's failed to do that; therefore, the Court concludes that the entire mass of the funds will be treated as the property of the accounts, not [RC]'s property.

The Court has very carefully considered the credibility of the witnesses. I devoted much time into evaluating the credibility of these witnesses. . . .

The Court finds that [RC] has poor credibility. The Court finds that the

witness for [Siblings] has excellent credibility, Ms. Wooldridge. It took a lot of time to explain to the Court and have the documentation to explain her testimony. Accordingly, the Court finds that the two million, forty thousand dollars, $2,040,276.00 is the property of the accounts and is not the property of [RC]. Accordingly, the Court awards a judgment for two million, forty thousand dollars -- forty thousand, two seventy-six dollars for [Siblings] against [RC].

The Court is mindful that in the $863,469.38 that [Siblings] allege that [RC] misappropriated does not include the Hawkins County property, which [RC] bought, has his mother pay the mortgage and he took the rent. Does not include the amount of money that went for his daughter's condominium in South Carolina. Does not include the value of the vehicles that we heard about. There was testimony about Lexus and Buicks and Lincolns and Mazdas and farm trucks. One part of that testimony was that . . . [RC] bought a new Buick for his mother just before she died; however he put the Buick in his name. So I find we're dealing with a real rascal here and I award the judgment. In addition I assess all court and discretionary costs against [RC]. This is in 8501 and not the estate. . . .

\* \* \*

MR. FOWLER: We'll just put down that order in both of them.

THE COURT: Well, I might mention . . . put on the record, that this estate was opened in August 5, '05. For four years we've limped along and for four years [RC] has miserably failed in his fiduciary duty in regard to the estate and he's failed miserably in his fiduciary duty in regard to the power of attorney that his mother gave him. The Court sua sponte names Ms. Wooldridge as administrator, CPA of the estate. The Court removes [RC] from any authority to do anything on behalf of the estate. . . .

In the written judgment that followed, the trial court provided:

Based upon the testimony in this hearing and the past hearings, the Court finds that [RC] fraudulently took Viola Copas'[s] money that she had entrusted to him through the abusive use of the power of attorney and profited from this abuse. He used his dominance to steal and embezzle her money. He took her money by commingling his money with her funds and by using her funds for

-9-

his personal use and benefit to such an extent that neither this Court nor [RC] can untangle the mess. Further, [RC]'s record keeping and his refusal to provide a complete and accurate accounting makes it impossible for this Court to determine what belonged to [RC] or his mother or how much he took of her funds for his own use and benefit. It is [RC]'s fault, through his willful and intentional failure to file a proper accounting, that the truth in this matter cannot be ascertained.

In endeavoring to ascertain how much property or money went into the commingled mass and who owns that property or money, every reasonable resolution as to what property belongs to the beneficiary should be made against [RC] as the fiduciary. The law is that if a fiduciary commingles his funds with the funds of his principal and he does not present evidence as to who has what funds, he is personally responsible for all of the funds. While acting as Mrs. Copas's fiduciary, [RC] used $2,040,276.00 of her money and failed to present to the Court's satisfaction what expenses were his or Mrs. Copas's. The Court further finds that [RC], the dominant party, not only abused his fiduciary power to take these funds from Mrs. Copas but he is also a thief. He willfully and intentionally converted Mrs. Copas's money to his own use and benefit, which was in contravention of Mrs. Copas's rights and to her and [Siblings'] detriment. . . .

The trial court entered a judgment against RC and in favor of Siblings for $2,040,276, plus attorney fees totaling $102,576.36. RC filed a timely appeal.

## II. ISSUES

The issues presented for review by RC are restated as follows:

1. Whether the trial court erred in rendering a conclusive ruling at a motion hearing without a full trial.

2. Whether the trial court erred in ruling the bank accounts were not "pay on death" to the remaining living owner of the account.

3. Whether the trial court erred in ruling that RC breached his fiduciary duty as attorney-in-fact for Mother.

## III. STANDARD OF REVIEW

In cases without a jury, we presume that the trial court's factual findings are correct. Tenn. R. App. P. 13(d); *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996). The factual findings will not be overturned unless the evidence preponderates against them. *Id.* The trial court's conclusions of law are reviewed under a de novo standard based on the record without a presumption of correctness. *Blackburn v. Blackburn*, 270 S.W.3d 42, 47 (Tenn. 2008).

We review credibility determinations made by the trier of fact with great deference. *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). The rationale for this deference is that trial courts observe witnesses as they testify and can draw inferences from their demeanor, thus placing those courts in the better situation to assess witness credibility. *Id.*

## IV. DISCUSSION

### A.

RC contends that the trial court denied him a fair trial when it rendered a judgment at a motion hearing. As to all issues raised by RC, Siblings assert that RC did not comply with Rule 27(a)(7) of the Tennessee Rules of Appellate Procedure, which states, in pertinent part, as follows:

> (a) **Brief of the Appellant.** The brief of the appellant shall contain under appropriate headings and in the order here indicated:
>
> * * *
>
> (7) An argument, which may be preceded by a summary of argument, setting forth:
>
> (A) the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate reference to the record (which may be quoted verbatim) relied on . . . .

Tenn. R. App. P. 27(a)(7)(A).

RC's argument regarding his first issue lacks any citation to any legal authority supporting his position. We have held that the failure to make appropriate references to the record and to cite authority in the argument section of the brief as required by Rule 27(a)(7) constitutes a waiver of the issue. *Lett v. Collis Foods, Inc.*, 60 S.W.3d 95, 105 (Tenn. Ct. App. 2001) ("Failure to cite relevant authority constitutes a waiver of the issue.").

RC has presented evidence, presented a witness, testified, and cross-examined Siblings' witnesses on at least three occasions. He had many opportunities to present all of the testimony and evidence that he believed was relevant to his case. In a formal judicial examination, RC has admitted the following:

1. He took $709,420.74 from Mother.

2. He has no additional information to provide to the trial court regarding the requested accountings and that he had provided the trial court with all the documents he could find.

3. He lived off the money from the refinancing of Mother's loans and from the sale of her land.

4. He used money from the Farm Account to pay his personal expenses, which included cars, personal loans, groceries, and his daughter's beach house.

5. His personal accounts and bills, the estate account and bills, Mother's accounts and bills, his wife's accounts and bills, and the Farm's Account and bills were all mixed and used together.

6. He commingled his personal funds with Mother's and not all of it can be separated.

After the presentation of the evidence and testimony that RC had to offer, the trial court examined the testimony and evidence and then decided the legal issues. RC has not identified any additional testimony or evidence that he would introduce at a trial that has not already been considered by the trial court. Based upon RC's admissions, a remand to the trial court will serve no purpose.

B.

The record reveals that at her death, Mother had several existing accounts at various

financial institutions. RC identified only four accounts on the inheritance tax return: (1) Farm Account; (2) 2005 Money Market Account; (3) Edward Jones Account, and (4) a savings account at SunTrust Bank.[5] RC asserts that the trial court should have found that the accounts were with survivorship. We find this issue relates to the Farm Account and 2005 Money Market Account, as these were the only accounts for which RC provided signature cards.

I.

In order for the Farm Account to pass outside the estate, Mother must have designated the account go to someone upon her death, such as a pay on death designation or right of survivorship designation. The signature card from October 9, 1990, identifies the Farm Account as a "Sole Owner" account. On January 12, 2005, while RC was Mother's attorney-in-fact, this account was changed to remove the name of Father, who had died several years before, by signing a Personal Account Signature Card. There are two boxes on the Personal Account Signature Card -- one box says "With Survivorship" and the other says "Without Survivorship." Neither box is checked.

Article I of Mother's Will provides that she considered the Farm Account to be hers and Father's. There is no evidence that Mother ever intended the Farm Account to become a survivorship account that would deprive Siblings of their inheritance under her Will.

Without an indication of survivorship on the account signature cards, this court must follow Tenn. Code Ann. § 45-2-703(e)(4), which creates a presumption against survivorship for multiple-party accounts when there is no clear language in documents opening or changing the account showing the decedent's intent to create a survivorship. The additional signature on the account is presumed to be an additional authorized signatory without a survivorship indication. Tenn. Code Ann. § 45-2-703(e)(4) (2009); *In re Estate of Nelson*, No. W2006-00030-COA-R3-CV, 2007 WL 851265, at *9 (Tenn. Ct. App. Mar. 22, 2007); *Estate of Verkstrom*, No. 03A01-CH-00267, 1999 WL 85713, at *2 (Tenn. Ct. App. Jan. 28, 1999).

RC's position that the Farm Account is a survivorship account is based upon the way SunTrust Bank classified it. Ms. Napier, a SunTrust Bank employee who did not assist

---

[5] RC never provided any information or documentation regarding the SunTrust Bank savings account in any accounting. His witness, Melissa Napier from SunTrust Bank, did not identify a SunTrust Bank savings account in Mother's name at her death. It further appears that Mother had an account at First Community Bank for which RC failed to provide records in any accounting.

Mother with establishing or changing the Farm Account and who was not employed by SunTrust Bank until after Mother made her final change to the account in 2005, had no independent knowledge concerning whether Mother intended the account to be a survivorship account. She simply testified that it was SunTrust's policy that multiple-party accounts were classified as joint accounts with right of survivorship. Further, she stated that she did not know what kind of account it was in 1990 because it is marked "Sole Owner Account" and survivorship is not marked. This is a similar argument to the one we rejected in *Estate of Verkstrom*, 1999 WL 85713, at \*1-2. In that case, we held that Tenn. Code Ann. § 45-2-703(e)(4) established a presumption that the account was not a survivorship account and rejected appellant's argument that the bank's classification controls survivorship. *Id*. at \*2. Likewise, in this matter, we reject the argument that the bank's classification overcomes Tenn. Code Ann. § 45-2-703(e)(4)'s presumption against survivorship. Therefore, the trial court correctly held that the Farm Account was part of the estate unless RC could present clear and convincing evidence that Mother intended to create a survivorship right.

RC presented no other evidence to rebut the statutory presumption and does not cite to any in his brief. As an authorized signatory on the account, RC held a power of attorney with respect to the account but was not an owner. *Estate of Verkstrom*, 1999 WL 85713, at \*2. A survivor unable to offer oral or written proof of the intent to contract for a right of survivorship has failed to establish the existence of such a contract. *See In re: Miller*, 158 S.W.3d 429 (Tenn. Ct. App. 2004)(finding purported beneficiary's uncorroborated testimony insufficient); *Carmical v. Kilpatrick*, No. M2002-00346-COA-R3-CV, 2002 WL 31863293 (Tenn. Ct. App. Dec. 23, 2002) (finding bank's policy of using "or" to indicate right of survivorship lacking as proof of depositor's intent). We find that the trial court properly determined that the Farm Account was not a survivorship account but was part of Mother's estate.

II.

While the 2005 Money Market Account is marked as a survivorship account, the trial court found that this account belonged to the estate because RC obtained this survivorship right through undue influence.

"[T]he doctrine of undue influence is applicable only where there is a confidential relationship[.]" *In re Estate of Brevard*, 213 S.W.3d 298, 302 (Tenn. Ct. App. 2006) (citing *Keasler v. Estate of Keasler*, 973 S.W.2d 213, 219 (Tenn. Ct. App. 1977). In general, a confidential relationship is one "that gives one person the ability to exercise dominion and control over another." *Kelley v. Johns*, 96 S.W.3d 189, 197 (Tenn. Ct. App. 2002). It is well established in Tennessee that "a confidential relationship arises as a matter of law when an unrestricted power of attorney is granted to the dominant party." *Childress v. Currie*, 74

S.W.3d 324, 328 (Tenn. 2002). The routinely recognized presumption is that when a confidential relationship exists and the dominant party receives a benefit from the other party that the dominant party used undue influence to obtain the benefit. *Richmond v. Christian*, 555 S.W.2d 105, 107 (Tenn. 1997); *Matlock v. Simpson*, 902 S.W.2d 384, 385 (Tenn. 1995); *Hogan v. Cooper*, 619 S.W.2d 516, 519-20 (Tenn. 1981). The determination of whether the dominant party exerted undue influence is a question of fact. *Waller v. Evans*, No. M2008-00312-COA-R3-CV, 2009 WL 723519, at *9 (Tenn. Ct. App. Mar. 17, 2009).

Clearly, RC and Mother were in a confidential relationship based upon RC's use of the unrestricted POA. *Matlock*, 902 S.W.2d at 386; *Smith v. Smith*, 102 S.W.3d 648, 653 (Tenn. Ct. App. 2002). On January 20, 2005, while Mother was recovering from a broken hip and was in and out of the hospital, her signature appears on the signature card for this account indicating it was a right of survivorship account. The establishment by RC of a survivorship account with Mother triggered the presumption of undue influence. Where a presumption of undue influence arises, it may be rebutted only by clear and convincing evidence. *Matlock*, 902 S.W.2d at 386.

Accordingly, RC had the burden to prove by clear and convincing evidence that the transaction was Mother's free will and not a result of his influence. However, he failed to present any evidence that this transaction was fair, asserting only self-serving statements that Mother knew what he was doing and did not make him undo any transactions. Thus, he failed to point to any evidence to overcome the presumption of undue influence. The trial court's determination that the 2005 Money Market Account was part of the estate is therefore affirmed.

C.

As the attorney-in-fact for Mother, RC was obligated to handle her property honestly and loyally with the "utmost good faith." *Martin v. Moore*, 109 S.W.3d 305, 309 (Tenn. Ct. App. 2003). However, he has not presented any evidence to establish clearly and convincingly that the transactions by which he received benefits to the detriment of Mother met this required standard. Thus, we find that the trial court did not err in finding that RC breached his fiduciary duty to Mother.

-15-

## V. CONCLUSION

The judgment of the trial court is affirmed and this cause is remanded to the trial court for collection of the costs below. Costs of the appeal are assessed to the appellant, Randall Copas.

_____
JOHN W. McCLARTY, JUDGE