IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 4, 2002 Session

## BRENDA MARTIN, EXECUTOR OF THE ESTATE OF DEWEY O. MOORE v. JEAN MOORE

Appeal from the Chancery Court for Clay County
No. 3552     Vernon Neal, Chancellor

No. M2001-03144-COA-R3-CV - Filed January 23, 2003

A man who had been diagnosed with dementia executed a power of attorney in favor of his wife. The wife used the power to withdraw all the money from her husband's separately owned bank account, and sent most of it to her brother for investment overseas. She also completed the sale of real property her husband had owned in Kentucky, and placed the proceeds in a marital account. After his death, the man's daughter from a previous marriage brought suit for breach of fiduciary duty, asking for the return of the assets to his estate. The trial court ordered the return of the money taken from the bank account, but ruled that the wife was entitled to keep the proceeds from the sale of the real property. The court also ordered the wife to pay some of the daughter's attorney fees. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right ; Judgment of the Chancery Court Affirmed and Remanded**

BEN H. CANTRELL, P.J., M.S., delivered the opinion of the court, in which PATRICIA J. COTTRELL, J. and ALLEN W. WALLACE, SP. J., joined.

Randle W. Hill, Jr., Nashville, Tennessee, for the appellant, Jean Moore.

August C. Winter, Brentwood, Tennessee, for the appellee, Brenda Martin.

## OPINION

### I. A POWER OF ATTORNEY

In June of 1997, sixty-eight-year-old Dewey Moore was experiencing some difficulty with gait, balance, muscle tone and memory. He went to several doctors, one of whom diagnosed him with mild dementia and referred him to the Veterans Hospital in Nashville for neurological testing. After admission to the hospital, he was diagnosed with Alzheimer's disease and a progressive

neurological disorder. Shortly after he was released from the hospital, Mr. Moore executed a power of attorney in favor of Jeanetta Moore (hereinafter referred to as Jean Moore), his wife of eighteen years. Dewey Moore declined rapidly thereafter, and died on December 30, 1997.

Mr. Moore had executed a Last Will and Testament on September 13, 1996. The will devised "the real property where I reside at the time of my death," to his wife. "All remaining real property, if any" was bequeathed to Phillip Martin and Blake Martin, Mr. Moore's grandsons. Ms. Moore was also granted "all vehicles, including all recreational vehicles," and all household property. Brenda Martin, Mr. Moore's daughter from an earlier marriage, was named as the residuary beneficiary. The will nominated Jean Moore and Brenda Martin as co-executrixes. The two women filed a petition to probate the will in the Chancery Court for Clay County, and Letters Testamentary were issued to them.

## II. PRE-TRIAL PROCEEDINGS

On April 30, 1998, Brenda Martin filed a complaint against Jean Moore on behalf of the estate. She claimed that Mr. Moore was not competent when he signed the power of attorney, and that prior to Mr. Moore's death, his wife had used the power to transfer his money and other property to herself, in violation of her fiduciary duty. For the purposes of this discussion, the most important allegation was that Jean Moore had made two withdrawals totaling $66,076 from her husband's separately-owned checking account, thereby closing the account, and used the funds for her own benefit. The plaintiff asked the court to order the return of the assets to the estate, and to tax the defendant with costs, attorney fees, and interest. In her answer, the defendant admitted that she had withdrawn the money from the account, but denied that she had done anything wrong.

Brenda Martin subsequently amended her complaint to allege that handwriting analysis had revealed that the signature on the power of attorney was not Mr. Moore's. The plaintiff further alleged that the defendant, a native of the Philippines, had sent $45,000 of the money she withdrew from her husband's bank account to her brother, so he could buy a chicken farm in that country.

Ms. Martin also filed a Motion for Partial Summary Judgment, asking the court to restore the $45,000 of misappropriated funds to the estate. The trial court denied the motion, but signed an Agreed Order that a check for $45,000 from a third party, which was payable to the estate, be instead paid into the court and placed in an interest bearing account to secure the claims Ms. Martin was asserting on the estate's behalf.

After further discovery, Brenda Martin filed a Second Amended Complaint, alleging facts that she said had not been known to her earlier. She claimed that Jean Moore had used her power of attorney to convey to herself her husband's interest in a land sales contract and promissory note related to real property located in Cumberland County, Kentucky, and that she subsequently sold the property to third parties for $84,000. She alleged that the land was Mr. Moore's separate property, and should have passed to his grandsons under the will. Ms. Moore answered that she had an

interest in the property, because she had contributed to its acquisition, and was a party to the original 1994 contract for the sale of the land.

### III. TRIAL AND JUDGMENT

The case went to trial on March 26, 2001. Jean Moore and Brenda Martin were the only witnesses to testify. Twenty exhibits were introduced into the record, including financial records, deeds, a hand-drawn map, and five depositions. At the conclusion of the trial, the judge took the case under advisement, so he could study the record. On June 25, 2001, he set out his findings in a Memorandum Opinion.

The trial judge credited the deposition testimony of the witnesses to the signing of the power of attorney, and declared that Mr. Moore had signed the document as his free act and deed, and that he was competent at the time to do so. However, the judge agreed with the plaintiff that Jean Moore had breached her fiduciary duty by withdrawing the entire balance from her husband's separate checking account, and using it to purchase property in which Mr. Moore had no interest. The court found that the transaction was not reasonable under the circumstances, and that the estate was entitled to recover the whole amount withdrawn, together with interest at the rate of 8% per annum, from the date of the filing of the complaint. The court further found that the defendant had intentionally breached her fiduciary duty, and that the estate was accordingly entitled to $2,500 in punitive damages.

The judge reasoned that the transactions involving the Kentucky land stood on a different footing. While he noted that the land had been Dewey Moore's separate property, he also found that the testator had contracted to sell the property in 1994. The promissory note which the purchasers had executed as consideration for the property was made payable to both Dewey and Jean Moore and was thus their joint property, and was held by the entireties.

The judge noted that in 1996, when Mr. Moore was still competent and acting on his own behalf, he could have reclaimed the land and retained the money the buyers had already paid, because they had not complied with the terms of the contract of sale. However, Mr. Moore chose not to do so. After the power of attorney was executed, the buyers came up with the funds to pay off the promissory note. The judge thus concluded that the wife had merely completed the execution of an executory contract which her husband had entered into earlier, and that the funds realized from the transaction passed to the defendant after her husband's death by the operation of law.

The judge also found that money that Mr. Moore had allegedly buried on his Tennessee land should be considered treasure-trove, and was therefore the sole property of the owner of the land, Jean Moore.

Ms. Moore subsequently filed a Motion to Alter or Amend the Judgment or for New Trial. *See* Tenn. R. Civ. P., Rule 59. Brenda Martin filed two motions, a Rule 54.02 motion for discretionary costs, and a motion for the award of attorney fees and litigation costs.

The trial court conducted a hearing on the motions of both parties on November 2, 2001. It denied Ms. Moore's Motion to Alter or Amend or for New Trial, but granted in part Ms. Martin's motion for discretionary costs. The court also awarded the plaintiff attorney fees and litigation costs in the amount of $35,802, with $15,705 taxed against the defendant, and $20,096.50 against the estate. This appeal followed.

## IV. THE DUTIES OF A FIDUCIARY

Our courts have long held that the execution of a power of attorney establishes a confidential or fiduciary relationship between the attorney in fact and the grantor of the power. *Matlock v. Simpson*, 902 S.W.2d 384 (Tenn. 1995); *Mitchell v. Smith*, 779 S.W.2d 384 (Tenn. Ct. App. 1989); *Askew v. Askew*, 619 S.W.2d 384 (Tenn. Ct. App. 1981); *Black v. Pettigrew*, 270 S.W.2d 196 (Tenn. Ct. App. 1953). Our Supreme Court has recently announced a narrow exception to this rule. In *Childress v. Currie,* 74 S.W.3d 324 (Tenn. 2002), the Court ruled that if the power of attorney is executed, but not exercised, a confidential relationship does not arise as a matter of law. This exception clearly does not apply in the present case.

Numerous opinions of our appellate courts have stated that the dominant party in a fiduciary relationship is obligated to deal with the property of the other party in the utmost good faith. *Estate of Doyle v. Hunt*, 60 S.W.3d 838 (Tenn. Ct. App. 2001); *Alexander v. Inman,* 974 S.W.2d 689 (Tenn. 1998); *McFarlin v. McFarlin*, 785 S.W.2d 367 (Tenn. Ct. App. 1989). Other cases have spoken of the duties of loyalty and honesty as also being a part of a fiduciary's obligation. *Roberts v. Iddins*, 797 S.W.2d 615 (Tenn. Ct. App. 1990); *Knox-Tenn Rental Co. v. Jenkins Ins., Inc.*,755 S.W.2d 33 (Tenn. 1988).

Finally, the existence of a confidential relationship, combined with a gift or benefit to the dominant party, creates a presumption of undue influence, and of the invalidity of the transaction. *Fell v. Rambo*, 6 S.W.3d 837 (Tenn. Ct. App. 2000). This presumption is not conclusive, however, for it may be rebutted by clear and convincing evidence of the fairness of the transaction. *Hager v. Fitzgerald,* 934 S.W.2d 668 (Tenn. Ct. App.1996); *Matlock v. Simpson*, 902 S.W.2d 385 (Tenn. 1995); *Bills v. Lindsay*, 909 S.W.2d 434 (Tenn. Ct. App.1993); *Gordon v. Thornton*, 584 S.W.2d 655 (Tenn. Ct. App. 1979).

Keeping these principles in mind, we now turn to the disputed transactions in the present case.

## V. MR. MOORE'S CHECKING ACCOUNT

The appellant, Jean Moore, argues that she did not breach her fiduciary duty with regard to her husband's separate checking account. She presents two alternate theories as to why she was authorized to deal with the account in the manner she did. The first is that the account was in fact joint property, and thus that she could dispose of it during Mr. Moore's lifetime as she saw fit. The second theory is that she was authorized by the terms of the power of attorney and by Tenn. Code

Ann. § 34-6-110 to use the power to make gifts to herself. We find neither of these theories persuasive.

The appellant testified that her husband regularly deposited money from the sale of marital assets into the account, and took money from the account to purchase other marital assets. She also notes that Mr. Moore customarily transferred money between the joint account of the parties and his own separate account. She reasons that these circumstances create an inference of joint ownership.

While this may be a permissible inference, it is not conclusive. The record shows that both parties had their own separate checking accounts, and that there was a joint account as well. It is thus also logical to infer that Mr. Moore intended his separate account to be the repository of funds that he considered his separate property.

It appears to us, however, that it doesn't matter all that much whether we deem the account to be Mr. Moore's separate property or jointly owned property.[1] The only way that Jean Moore could legally exercise control over the account was through her power of attorney. And by assuming that power, she also bound herself to deal with all the property in which Mr. Moore held an interest with the utmost good faith, as well as with honesty and with undivided loyalty.

The proof showed that Ms. Moore sent $47,000 to her brother, Doroteo O. Bautista, to buy a "chicken ranch" in the Philippines. The property was jointly titled in her name and that of her brother. She thus exchanged property held solely in Mr. Moore's name for property in which he held no legal interest. There is little evidence in the record that Mr. Moore ever expressed an intention to confer such a benefit on his wife, and no evidence at all that he bore such a benevolent intention towards Mr. Bautista.

Ms. Moore argues that if her husband had lived, he could have received a benefit from the Philippine investment, just as she received benefits from oil proceeds and lease payments derived from the Kentucky land that was titled solely in his name. She claims that even though her husband's name was not on the deed to the Philippine property, it was marital property, and that Mr. Moore could have claimed it as such if the parties had divorced, or if she had died first. It is obvious, however, that Mr. Moore would have had to depend on the good will of his wife and brother-in-law to enjoy any benefit at all, as the courts of this state would have had no power to reach the property overseas.

---

[1]The account clearly was not held in a tenancy by the entireties, since it was not titled in the names of both husband and wife. The essential characteristic of a tenancy by the entireties is that "each spouse is seized of the whole or the entirety and not a a share, moiety or divisible part." *Grahl v. Davis,* 971 S.W.2d 373 (Tenn. 1998), quoting *Sloan v. Jones*, 241 S.W.2d 506 (Tenn. 1951). Thus, even if the account could be deemed to be jointly owned, appellant's reliance on *Oliphant v. McAmis*, 273 S.W.2d 151 (Tenn. 1954), for the proposition that "she had every right to take funds from that account, regardless of the use therefore" is sadly misplaced.

As for the remainder of the funds in the account, the record does not indicate any pressing need for Jean Moore to use any of those funds for either Mr. Moore's medical expenses or for the expenses of their household, and there was no proof that they were used for either of those purposes. Since there was a balance of over $36,000 in the parties' joint checking account in August of 1997, there was apparently no reason for Ms. Moore to touch any of the funds in Mr. Moore's separate account. She nonetheless saw fit to completely empty the account.

The appellant argues as an alternate legal ground for her actions that she was authorized by the terms of the power of attorney, and by Tenn. Code Ann. § 34-6-110, to make a gift of the funds to herself. She notes that the statute came into effect on June 13, 1997, some 17 days before the execution of the power of attorney. The statute authorizes an attorney in fact to "execute or perform any act that the principal might or could do," including "the power and authority to make gifts, in any amount, of any of the principal's property, to any individuals, . . . ." However, it adds the caveat that such gifts be "in accordance with the principal's personal history of making or joining in the making of lifetime gifts." While Mr. Moore may have been a generous husband, there is no evidence in the record that he ever made joint gifts to his wife and his brother-in-law. Thus, when we consider the manner in which Jean Moore used the funds entrusted to her, we agree with the trial court that the transaction was not reasonable, that she breached her fiduciary duty, and that she should be compelled to return all of Mr. Moore's separate funds to his estate.

## VI. THE KENTUCKY PROPERTY

Dewey Moore bought a 68-acre piece of land in Cumberland County, Kentucky in 1972, prior to his marriage to the appellant. He bought an adjoining 12- acre property in 1982, a few years after the marriage. Jean Moore testified that she contributed $3,000 towards the purchase of the second property, but both deeds conveyed the property only to Dewey O. Moore. At some point, oil was discovered on the land, and Mr. Moore received regular royalty payments for several years before the oil stopped flowing.

The Moores built and occupied a residence on the Kentucky land, but they subsequently moved to Celina, Tennessee. On May 16, 1994, a land sale contract was executed whereby "Dewey O. Moore and Jeanette Moore, husband and wife" contracted to sell both tracts of Kentucky land to Michael Tallent and his wife. The purchase price was $84,000, with a down payment of $8,400 made at closing, monthly installments of $600 for thirty months, and the balance due on or before December, 1996. A promissory note was executed at the same time, payable to Dewey and Jean Moore.[2] The contract also provided that in the event of default, all monies paid were to be forfeited and considered as rental payments, and the land would revert to the Moores.

The Tallents failed to make a few monthly payments, and they did not manage to obtain financing for the remainder of the purchase price by December, 1996. Nonetheless, Mr. Moore

---

[2] The promissory note was not introduced at trial, but a copy was entered into the record. The appellee refers to the note in her brief as "the alleged promissory note."

decided to give the Tallents additional time. On August 29, 1997, Ms. Moore used her power of attorney to execute an assignment of Mr. Moore's interest in the land sales contract and the promissory note to herself. Meanwhile, Mr. Tallent's brother had decided to supply the necessary funds and to participate in the purchase. On September 15, 1997, Ms. Moore completed the sale of the land to the Tallents, and deposited the proceeds into the parties' joint account.

Brenda Martin argues that the sale of property thwarted Mr. Moore's desire, expressed in his will, to pass his real property on to his grandchildren (who were also her children). We note, however, that Mr. Moore signed the contract of sale on the Kentucky land while he was still capable of handling his own financial affairs, and that he later affirmed the contract despite the Tallents' default. Further, when Mr. Moore's will was executed, he had not yet been diagnosed with a life-threatening condition, and thus could have anticipated the possibility that he might purchase other real estate that might ultimately benefit his grandchildren.

The appellee argues that the transactions involving Jean Moore's use of the power of attorney to sell the land clearly benefitted her, thus raising the presumption of their invalidity. *See Fell v. Rambo*, 6 S.W.3d 837 (Tenn. Ct. App. 2000). We agree. However, her actions were consistent with Mr. Moore's wishes, and with his conduct prior to his illness. We therefore agree with the trial court that the presumption has been rebutted by clear and convincing evidence that the transactions were fair to Mr. Moore, and thus that the sale was not a breach of his wife's fiduciary duty.

## VII. BURIED TREASURE

One of the strangest aspects of this case involves a map that Dewey Moore drew for his daughter Brenda when she visited him in the hospital. Ms. Martin testified that her father told her that he had buried money underneath the soil of his Tennessee homeplace, and drew the map as he explained where it was. The map has been made a part of the record. It features a few simple shapes drawn on brown paper with a felt tip marker, with no words or numbers. Ms. Martin is the only person who can possibly understand the map, but the property where the money was allegedly buried now belongs solely to Ms. Moore.

Ms. Martin filed a Motion for Entry Upon Land, for the purpose of digging on Ms. Moore's land to determine whether she could locate the money and restore it to the estate. The trial court granted the motion, and ordered Ms. Martin to complete the digging within thirty days, and to execute a $1,000 bond to pay for any damages done. For some reason, her attorney never entered the order, and Ms. Martin never proceeded further.

In his Memorandum and Final Order, the trial judge declared that he had been in error to give Ms. Martin the right to enter upon Ms. Moore's land. He held that as fee simple owner of the Tennessee property, Ms. Moore was also the owner of anything buried upon it, because it was treasure trove. He relied upon *Morgan v. Wiser*, 711 S.W.2d 220 (Tenn. Ct. App. 1985), an opinion in which this court briefly discussed the concept, history and rationale behind this ancient doctrine.

Treasure trove refers to valuables buried on the land of another, where "the treasure [was] hidden or concealed so long as to indicate that the owner is probably dead or unknown." 711 S.W.2d at 222. In *Morgan*, supra, we declined to follow the common law rule, which gives the finder of such valuables priority of ownership over the owner of the land upon which it was buried. We reasoned that the landowner should have such priority, because the opposite rule created an incentive for trespassers to dig for buried treasure upon the land of others, and thereby to breach the peace.

In this case, the property in question is not treasure trove, because, assuming that it indeed exists, we already know the identity of the owner. However, the same considerations that led us to reject the common law rule in *Morgan* also apply in this situation. We do not believe that Ms. Moore may be compelled to allow Ms. Martin to enter upon her land and to dig holes in it, on the chance that she can find what she believes to be the property of the estate. Thus, although we disagree with the trial judge's characterization of the disputed property, we agree with his refusal to give Ms. Martin another opportunity to trespass on Ms. Moore's land. Of course, nothing prevents the two ladies from agreeing between themselves to mount a search and to divide anything they might find.

## VIII. ATTORNEY FEES

As we stated above, the trial court declared that it was awarding Ms. Martin attorney fees and litigation costs in the amount of $35,802, with $15,705 taxed against the defendant, and $20,096 against the estate. We note that the award should properly be considered to have been made to Ms. Martin in her capacity as executor of the estate, and not to her in her individual capacity.

The appellant argues that there is no statutory or contractual basis for the trial court's award of attorney fees. We believe, however, that there is a basis in case law and in statute for both components of the trial court's award. As the appellee notes, several cases of this court support the proposition that attorney fees may be awarded against a trustee who breaches her fiduciary duty. *Brandt v. Bib Enterprises*, 986 S.W.2d 586 (Tenn. Ct. App. 1998); *Marshall v. First National Bank of Lawrenceburg*, 622 S.W.2d 558 (Tenn. Ct. App. 1981).

Although attorney fees should not be imposed where there is merely a technical fault on the part of the fiduciary, 622 S.W.2d at 560, the imposition of such fees on fiduciaries who deliberately use their position of trust to enrich themselves creates a disincentive to such behavior. The trial court's finding that Ms. Moore intentionally withdrew her husband's separate funds from his checking account for her sole use and benefit is an appropriate predicate for the trial court's award.

Further, it is well established that a personal representative of an estate may be entitled to receive reasonable attorney fees from the estate, where the representative has advanced such fees, and the attorney's services have inured to the estate's benefit. *See* Tenn. Code Ann. § 30-2-606; *Wallace v. Collier*, 829 S.W.2d 696 (Tenn. Ct. App. 1992). We note that the litigation initiated and financed by Ms. Martin has resulted in the restoration to the estate of over $60,000, thus meeting the above requirements.

Where attorney fees are authorized by law, then the decision to award such fees is within the sound discretion of the trial court, and will not be reversed on appeal, absent abuse of that discretion. *Garfinkel v. Garfinkel*, 945 S.W.2d 744 (Tenn. Ct. App. 1996). The proof showed that Ms. Martin incurred substantial fees in the pursuit of funds for the estate, and that she submitted attorney bills slightly in excess of the total amount of the final award.

The appellant takes issue with the amount of the award, noting that Ms. Martin, a resident of North Carolina, retained an attorney from that state as well as one from Tennessee to represent her, when it would have been less expensive to proceed with a single attorney. She also notes that only part of the attorney fees relate to the successful claim for breach of fiduciary duty, and argues that the fees awarded should have been reduced by the proportion of the work that was expended on other issues.

We note, however, that Ms. Moore was charged with less than half of the attorney fees Ms. Martin incurred. The remainder was charged to the estate, and will ultimately result in no detriment to Ms. Moore, and no benefit to Ms. Martin, for as the residuary beneficiary, she would have received that money anyway. It thus appears to us that the award of attorney fees was not excessive, and that the trial court did not abuse its discretion.

## IX.

The judgment of the trial court is affirmed. Remand this cause to the Chancery Court of Clay County for further proceedings consistent with this opinion. Tax the costs on appeal to the appellant, Jean Moore.

_____
BEN H. CANTRELL, PRESIDING JUDGE, M.S.