FILED

11/12/2021

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 08, 2021 Session

## JOHN L. MITCHELL, ADMINISTRATOR FOR THE ESTATE OF LOUISIANNA CLARDY MCCLARON, DECEASED v. WILLIAM C. JOHNSON ET AL.

**Appeal from the Chancery Court for Montgomery County**
**No. MC CH CV RE-18-12        Laurence M. McMillian, Jr., Chancellor**

---

### No. M2020-01243-COA-R3-CV

---

This is an action by the administrator of the estate of Louisianna McClaron ("the decedent" or "Ms. McClaron") to recover assets converted by the decedent's attorneys-in-fact based upon, *inter alia*, their use of the power of attorney to name themselves as joint owners with right of survivorship on the decedent's financial accounts, as the pay-on-death beneficiaries of her annuities, and as beneficiaries of the decedent's life insurance policies. The attorneys-in-fact used the power of attorney to sell real estate, the proceeds of which they deposited into a joint account that benefitted themselves. They also used the power of attorney to transfer $112,000 of the decedent's bank funds to themselves and their children. The attorneys-in-fact admitted to engaging in all of the transactions identified in the complaint and did not contest the existence of a confidential relationship; rather, they denied liability, contending their actions were authorized and beneficial to Ms. McClaron based on "an understanding" they had with her. They contended to having an oral agreement with the decedent whereby they would care for and assist the decedent and her sister, who lived together, until they died, at which time the attorneys-in-fact would receive the decedent's estate. Following discovery and the admission by the attorneys-in-fact of all the material facts set forth in the administrator's statement of undisputed facts, the administrator moved for partial summary judgment. After ruling that any evidence of a purported understanding with the decedent was barred pursuant to the Dead Man's Statute, the trial court granted partial summary judgment as to liability on the basis of the presumption of undue influence and the breach of fiduciary duties by the attorneys-in-fact for engaging in transactions that resulted in no benefit to the decedent. Following a bench trial on damages, the court entered a judgment identifying the property to be restored to the estate and the amount of damages to be awarded; the court also declared a deed purportedly conveying the decedent's home to the attorneys-in-fact null and void. The attorneys-in-fact appeal, contending the grant of summary judgment was inappropriate because material facts are in dispute. More specifically, they contend the trial court erroneously deemed the subject of their "understanding" or "agreement" with Ms. McClaron inadmissible under

the Dead Man's Statute, which precluded them from presenting clear and convincing evidence of the fairness of the transactions or how Ms. McClaron benefitted from the transactions. The record before us reveals it is undisputed that the attorneys-in-fact exercised the power of attorney; therefore, a fiduciary relationship existed. *See Childress v. Currie*, 74 S.W.3d 324, 328–29 (Tenn. 2002). As a consequence, they owed a fiduciary duty to deal with Ms. McClaron's property in the "utmost good faith," *see Ralston v. Hobbs*, 306 S.W.3d 213, 221 (Tenn. Ct. App. 2009), and to act primarily for the benefit of Ms. McClaron, *see McRedmond v. Est. of Marianelli*, 46 S.W.3d 730, 738 (Tenn. Ct. App. 2000). However, the undisputed facts establish that the transactions orchestrated by the Johnsons were not necessary to protect the interest of Ms. McClaron. *See Folts v. Jones*, 132 S.W.2d 205, 208 (Tenn. 1939). The undisputed facts establish that Ms. McClaron did not benefit from the transactions at issue and the transactions were not fair to Ms. McClaron. In contrast, the undisputed facts reveal that the Johnsons benefitted from each transaction. Having determined that the undisputed material facts and the relevant legal principles fully support the trial court's determination that the Johnsons breached their fiduciary duties to Ms. McClaron as well as the trial court's grant of partial summary judgment in favor of the administrator of the estate on the issue of liability, we affirm the trial court in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined.

Michael P. Mills, Franklin, Tennessee, for the appellants, Rita Y. Johnson and William C. Johnson.

Roger A. Maness, Clarksville, Tennessee, for the appellee, John L. Mitchell.

**OPINION**

**FACTUAL AND PROCEDURAL BACKGROUND**

Ms. McClaron and her sister, Frankie Harrington ("Ms. Harrington"), resided together for years in a home on Cheshire Road in Clarksville, Tennessee, which they owned as joint tenants with right of survivorship. The defendants to this action, husband and wife William and Rita Johnson (collectively, "the Johnsons"), lived down the street.[1] Barbara Johnson, the mother of defendant William Johnson, was a long-time friend of Ms.

---

[1] Rita Johnson was a registered nurse, and William Johnson was employed as a firefighter for the Clarksville Fire Department.

McClaron and Ms. Harrington and served as a volunteer caregiver for the sisters for a number of years before and after the Johnsons became the attorneys-in-fact for the sisters.[2]

Prior to when Rita Johnson became personally acquainted with Ms. McClaron, her mother-in-law, Barbara Johnson, assisted the sisters with their daily needs. After becoming acquainted with Ms. McClaron sometime in 2009 or early 2010, Rita Johnson assisted in caring for the sisters and was principally responsible for taking them to doctors, dentists, hairdressers, and other appointments. It was during this time that Rita Johnson realized, based on her day-to-day communications with Ms. McClaron, that Ms. McClaron was exhibiting signs of dementia and was incapable of managing her personal affairs. [3]

On October 5, 2010, Ms. McClaron executed a durable general power of attorney ("the Power of Attorney") appointing the Johnsons as her attorneys-in-fact.[4] Shortly after being appointed attorney-in-fact, Rita Johnson took Ms. McClaron to her doctor, Dr. Paul S. Cha. During this visit, Ms. Johnson learned that Ms. McClaron had been previously diagnosed with Alzheimer's Disease and dementia.

Within six weeks of being appointed attorney-in-fact, Rita Johnson began making material changes to substantially all of Ms. McClaron's assets, including bank accounts, insurance policies, and annuity contracts. All of these changes significantly benefitted Rita Johnson and/or her husband, either immediately or upon Ms. McClaron's death.

On November 10, 2010, Rita Johnson set up accounts at First Federal Savings Bank for Ms. McClaron, on which Rita Johnson designated herself as the joint owner and as the pay-on-death beneficiary. In July 2011, Rita Johnson closed three of Ms. McClaron's bank accounts at Regions Bank and deposited the proceeds into a joint account at First Federal Savings Bank (now First Advantage Bank).

In the interim, on December 23, 2010, Rita Johnson executed paperwork to add herself as the beneficiary of Ms. McClaron's annuity with Lincoln Financial. It had an account value of $56,965.54 as of February 26, 2018.

---

[2] Barbara Johnson, who was a contemporary of and had known Ms. McClaron and Ms. Harrington for at least forty-five years, served as the attorney-in-fact for Ms. McClaron and Ms. Harrington for a brief period of time before the Johnsons were appointed in 2010.

[3] On August 30, 2010, Dr. Constance J. Johnson, M.D., found that Ms. McClaron was incapable of managing her personal affairs due to Alzheimer's related dementia.

[4] Ms. McClaron was 80 years old at the time. On the same day, Ms. Harrington executed a separate durable general power of attorney appointing the Johnsons as her attorneys-in-fact.

Ms. McClaron owned an annuity with Delaware Life. In October 2011, Rita Johnson executed paperwork to designate herself as the beneficiary of the annuity. It had a value of $171,857.96 as of March 31, 2018.

Rita Johnson executed paperwork to make herself the beneficiary of Ms. McClaron's annuity with New York Life sometime before August 11, 2013. As of August 11, 2017, it had a value of $32,840.37.

Ms. McClaron owned another annuity with New York Life. In August 2011, Rita Johnson executed paperwork to add herself as a beneficiary of the annuity. It had a value of $55,622,56 as of February 5, 2018.[5]

As noted above, Ms. McClaron and her sister, Ms. Harrington, owned their home on Cheshire Road in Clarksville, Tennessee, as joint tenants with right of survivorship. In January of 2013, Rita Johnson drove Ms. Harrington to Lloyd Title and Escrow in Clarksville to execute a quitclaim deed. The deed, which was prepared at the request of Rita Johnson, purported to convey Ms. Harrington and Ms. McClaron's home on Cheshire Road to themselves and Rita and William Johnson as "joint Tenants in Common with Rights of Survivorship." Ms. Harrington signed the deed in the presence of the notary, Lettie Kendall, and the acknowledgment of Ms. Harrington's signature on the deed was notarized by Ms. Kendall. Ms. McClaron also signed the deed, but she did not go to the offices of Lloyd Title and Escrow, and Ms. McClaron did not sign the deed in the presence of a notary. No consideration was shown on the deed. Moreover, neither Ms. Harrington nor Ms. McClaron had independent advice of counsel before signing the deed.

On May 3, 2013, Rita Johnson closed two of Ms. McClaron's accounts at SunTrust Bank and deposited the proceeds into an account at First Advantage Bank that listed Rita Johnson as a joint owner and the pay-on-death beneficiary.

Ms. McClaron also owned a rental home on Joyner Avenue in Nashville, Tennessee. Using the Power of Attorney, William Johnson sold that home in 2013 and deposited the proceeds from that sale into one of the bank accounts at First Advantage Bank, on which Rita Johnson was a joint owner and the pay-on-death beneficiary.

In addition to the foregoing transactions, Rita Johnson used the Power of Attorney on several occasions to transfer cash payments from Ms. McClaron's bank accounts to herself, her husband, William Johnson, and/or her children, Taylor and Mason. The total of these financial transactions was $112,000.00.

---

[5] The change of beneficiary attempts by Rita Johnson were not authorized by the company. New York Life required Rita Johnson to supply the Power of Attorney and a certificate of examination by a physician. Even after she provided these documents, the company would not allow Rita Johnson to name herself beneficiary. The designation was ultimately made to "Rita Johnsons, POA."

By the time Ms. McClaron passed away, the Johnsons had consolidated her assets and arranged for themselves to have the survivorship rights or be the pay-on-death beneficiaries of bank and investment accounts in excess of $700,000. In addition, the Johnsons arranged to be joint tenants with right of survivorship with respect to her house and residential lot on Cheshire Road in Clarksville. Significantly, there is no proof in the record to suggest that Ms. McClaron had any knowledge of the foregoing transactions before or after they occurred, nor any proof that she received independent advice of counsel concerning any of the transactions.

Ms. McClaron died intestate on December 5, 2017, leaving no surviving spouse or issue.[6] Upon her death, her heirs at law retained attorney John L. Mitchell to file a petition to administer her estate and to recover her assets. Shortly thereafter, Mr. Mitchell ("the Administrator") was appointed the administrator of Ms. McClaron's estate.

The Administrator commenced this action against the Johnsons, asserting, *inter alia*, that the Power of Attorney was ineffective because Ms. McClaron did not have the mental capacity to execute a power of attorney. The complaint asserted that the assets and property rights obtained by the Johnsons were the result of the Johnsons' dominion and control over Ms. McClaron and their exercise of undue influence over her. The complaint also asserted that the Johnsons, while acting in their fiduciary capacity as attorneys-in-fact for Ms. McClaron, "individually or in combination, converted hundreds of thousands of dollars of cash, retirement accounts, investment accounts and real property belonging to Ms. McClaron to their ownership and control by exerting undue influence over her or by other means."

After counsel for the Johnsons made an appearance, the parties entered into an agreed-upon temporary injunction that enjoined the Johnsons and their agents from liquidating, disposing, or transferring any property from which they derived ownership, title, possession, or control from Ms. McClaron pending the final resolution of the case.

The Johnsons then filed an answer in which they admitted using their powers of attorney to make the changes to Ms. McClaron's bank accounts, insurance policies, annuities, and real estate holdings referenced in the complaint but denied that the transactions "were not beneficial to Ms. McClaron." The Johnsons also contended that their actions were authorized by an understanding pursuant to which they agreed to act as caregivers and assist the sisters in their daily lives, specifically so that the sisters could remain in the house located at 204 Cheshire Road, Clarksville, Tennessee, as long as

---

[6] Frankie Harrington predeceased Ms. McClaron, dying on December 7, 2015. Following her death, the Estate of Frankie Harrington commenced an action for, *inter alia*, breach of fiduciary duty against Barbara Johnson and the Johnsons, all three of whom served as her attorneys-in-fact. The allegations, defenses and facts related to that separate action are not discussed in this opinion.

possible, including after the death of one of them in exchange for Ms. McClaron's assets at her death. The Johnsons also conceded that "the Quitclaim Deed was not signed by Ms. McClaron in the presence of a Notary Public," but stated "that the Quitclaim Deed was taken by Ms. Harrington and Mrs. Johnson to the Notary Public to notarize the document."

As an affirmative defense, the Johnsons proposed that the gifts and financial arrangements "were made with the knowledge and agreement of Frankie Harrington on behalf of her and her sister, and possibly with the agreement of Ms. McClaron through her sister, and were knowingly and freely given without undue influence by them, in appreciation and compensation for their extensive daily care and activities involving Ms. McClaron and her sister."[7] The Johnsons identified the daily care provided to include the following: taking care of the sisters' physical and household needs; taking care of their properties; taking them shopping; taking them to doctors, dentists, hairdressers, and other appointments; taking them to church; and making sure they were eating, bathing, and dressing.[8] The Johnsons also asserted that Rita Johnson often spent the night with the sisters to make sure they were able to attend and participate in numerous social and church activities. Further, the Johnsons continued to care for Ms. McClaron after Ms. Harrington's death.

The Administrator moved the court for partial summary judgment against the Johnsons on the issue of liability. The motion was principally supported by a statement of undisputed facts that established all of the material allegations in the complaint.[9] In opposition to the motion for partial summary judgment, the Johnsons argued the existence of an agreement with Ms. McClaron that if they cared for her until her death, they would receive her assets.[10] They argued that they upheld the agreement by rendering the agreed-upon services. In support of this argument, the Johnsons presented the declarations of Ms. Lillian E. Hatcher, Ms. Barbara Johnson, Mr. William Johnson, and Mrs. Rita Johnson.

The declaration of Lillian E. Hatcher, a friend of Ms. McClaron, states in pertinent part:

---

[7] We note that while the complaint and the Johnsons' answer assert that the Johnsons entered into an agreement with Ms. Harrington on behalf of Ms. McClaron, the Johnsons' declarations state that they entered into an agreement with Ms. McClaron herself.

[8] The Johnsons did not countersue for quantum meruit, nor did they present evidence as to the value of their services.

[9] The Johnsons filed a response to the statement of undisputed facts in which they admitted essentially all of the material facts set forth in the statement of undisputed facts supporting the motion for summary judgment. Thus, the material facts relied upon to support the motion for partial summary judgment were undisputed.

[10] They also alleged they had a similar agreement with Ms. Harrington, but that agreement is not at issue in this appeal.

7. I am aware that William and Rita Johnson took care of Louisianna McClaron and Frankie Harrington for many years toward the end of their respective lives. I have never known William Johnson or Rita Johnson to be other than good, honest, and helpful people. I do not believe it would be in their character to have taken advantage of Ms. McClaron or her sister, Frankie Harrington.

Barbara Johnson's declaration stated:

3. I lived with Louisianna McClaron and Frankie Harrington from 2013 to 2016 and helped them with their physical needs, especially cooking. Louisianna McClaron still knew what she was doing mentally in 2010 through 2013, and she certainly knew what she was doing in October 2010. While we were living together, I fell and Ms. McClaron called 911 to have an ambulance come to the house. She had physical limitations, but her mind was still sharp.

William Johnson's declaration stated:

7. By agreement with Ms. McClaron and her sister, Frankie Harrington, Rita Johnson and I agreed that we would be Ms. McClaron's Power of Attorney (and the Power of attorney for Frankie Harrington) and assist them with their daily needs and care. They wanted to make sure they could stay in their home as long as possible.

    Rita Johnson and I saw to their daily needs and care and assisted in the consolidation and oversight of Ms. McClaron's finances. I deny exercising undue influence over [Ms. McClaron]. We did consolidate Ms. McClaron's bank accounts and investment accounts. Rita Johnson and I were designated on some of the accounts as death beneficiaries or survivor beneficiaries on accounts. I deny expending any money belonging to Ms. McClaron for my use, or the use of Rita Johnson or our family.

8. I deny that the conveyance or the financial transactions referenced in this action were not beneficial to Ms. McClaron and her sister. The agreement and understanding reached with Ms. Harrington and Ms. McClaron was that we would act as caregivers and assist the sisters in their daily lives, specifically so that they could remain in the house located at 204 Cheshire Road, Clarksville, Tennessee, as long as possible.

The extensive daily care and activities provided by and through Rita Johnson and myself included, but were not limited to, taking care of their physical needs, household needs, care of their properties, shopping, taking them to doctors, dentists, hairdressers and other appointments, taking them to church, and making sure they were eating, bathing, and dressing. Rita Johnson often spent the night at their Cheshire Road house. I made sure both sisters were able to get to and participate in numerous church and social activities. Rita Johnson and I continued to care for Louisianna McClaron after the death of her sister, Ms. Harrington, as per the understanding reached with Ms. Harrington and her sister.

Rita Johnson's declaration mirrored Mr. Johnson's nearly verbatim.

After reviewing the motion, the response, and declarations in support of the response, the trial court refused to consider the Johnsons' assertions regarding their purported agreement with Ms. McClaron. The trial court held that the assertions served to prove the existence of an agreement between Ms. McClaron and the Johnsons, which was impermissible under the Dead Man's Statute, Tenn. Code Ann. § 24-1-203. The trial court granted the Administrator's motion for partial summary judgment on the issue of liability after a hearing. The trial court's order was not based on whether or not Ms. McClaron had the capacity to create the Power of Attorney in October of 2010. Rather, the court found that the Johnsons presented no evidence from which a reasonable trier of fact could find the presumption of undue influence had been overcome by clear and convincing evidence. The court also found that the transactions engaged in by the attorneys-in-fact were not fair to the decedent, resulted in no benefit to Ms. McClaron, and that Ms. McClaron received no independent advice regarding the transactions. The trial court's order states:

1. The decedent, Louisianna C. McClaron, executed a power of attorney, at a time when she had been diagnosed with Alzheimer's Disease. As discussed below, the Court's decision is not based on [Ms. McClaron]'s lack of capacity to sign a power of attorney.

2. Thirty-six (36) days after the execution of the power of attorney, and thereafter, within three months, the defendants had changed beneficiaries on the decedent's financial accounts to themselves and established themselves as, among other designations, pay-on-death beneficiaries. Within this time period, the decedent, Louisianna C. McClaron's sister, Frankie Harrington, was still living.

3. On January 18, 2013, the defendants received an ownership interest with a right of survivorship in Ms. McClaron's home which had been jointly owned between Ms. McClaron and her sister, Ms. Harrington.

4. A confidential relationship existed between the defendants and the decedent by virtue of the power of attorney that had been exercised to establish accounts on which the defendants were joint tenants with right of survivorship or pay-on-death beneficiaries.

5. A fiduciary duty arose because of the power of attorney.

6. There was no benefit to the decedent, Ms. McClaron, from any of the transactions accompanied by the defendants by the use of a power of attorney, especially taking into account the timing of the transactions.

7. There was no independent advice received by Ms. McClaron on any of the transactions.

8. There is no clear and convincing evidence in the record from which a jury could reasonably conclude that the transactions, at the time they were made, were fair.

9. The Dead Man's Statute prohibits any reference to an agreement with the decedent as attempted by the defendants in their responsive filings.

10. Plaintiff is therefore entitled to judgment as a matter of law on the issue of liability.

Following its decision to grant the Administrator's motion for partial summary judgment, the trial court set the case for a bench trial to determine the remaining issues. Those issues included which assets belonging to Ms. McClaron were converted by defendants, the current state of those assets, and the relief that should be awarded to the estate. The court determined that the deed purporting to convey a one-third interest of Ms. McClaron's home and the lot on Cheshire Road to the Johnsons as joint tenants in common with rights of survivorship was null and void. The trial court found that Ms. McClaron owned the following assets at her death: (1) the First Advantage Bank checking account, totaling $356,019.32; (2) the First Advantage Bank savings account, totaling $103,042.75; (3) the Delaware Life annuity contract with a $173,270.17 value; (4) two New York Life annuity contracts, with a combined value of $88,482.93; (5) the Lincoln Financial annuity contract, with a $58,674.51 value; and (6) an SUV of an unknown model, year, and value. The Johnsons were ordered to facilitate the return of all the above-listed assets. This appeal followed.

**ISSUES**

Having considered the very broad issue the Johnsons present,[11] we find it appropriate to state the issues as follows:

I.  Whether the trial court erred by applying the Dead Man's Statute to exclude the Johnsons' testimony on the subject of an understanding with Ms. McClaron pursuant to which they agreed to attend to her personal needs for the rest of her life in consideration for receiving all of her remaining assets at her death.

II.  Whether the trial court erred in granting partial summary judgment in favor of the Administrator of the Estate based on the determination that the Johnsons breached their fiduciary duties to Ms. McClaron.

### STANDARD OF REVIEW

This court reviews a trial court's decision on a motion for summary judgment de novo without a presumption of correctness. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015). Accordingly, this court must make a fresh determination of whether the requirements of Tenn. R. Civ. P. 56 have been satisfied. *Id.*; *Hunter v. Brown*, 955 S.W.2d 49, 50 (Tenn. 1997). In so doing, we consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002).

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04.

When a motion for summary judgment is made and supported as provided in Tenn. R. Civ. P. 56, the nonmoving party may not rest on the allegations or denials in its pleadings. *Id.* at 265. Instead, the nonmoving party must respond with specific facts showing that there is a genuine issue for trial. *Id.* A fact is material "if it must be decided

---

[11] The sole issue raised by the Johnsons reads: "Whether the trial Court improperly granted Summary Judgment when material facts were in dispute." However, in the Summary of Argument in their brief, the Johnsons contend:

The trial court improperly granted summary judgment when material facts were in dispute. The record contains numerous disputed material facts on the issue of undue influence and fairness of the relationship to the decedent. The trial court improperly weighed the burden of proof rather than determining whether material facts were in dispute. The trial court erred in relying on the dead man's statute to determine that there were no disputed material facts.

in order to resolve the substantive claim or defense at which the motion is directed." *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993). A "genuine issue" exists if "a reasonable jury could legitimately resolve that fact in favor of one side or the other." *Id.*

## ANALYSIS

The Johnsons contend they had an understanding, an agreement, with Ms. McClaron pursuant to which they would provide personal care and assistance to and for Ms. McClaron for the rest of her life in consideration for receiving the assets she owned at the time of her death. The trial court, however, relying on the Dead Man's Statute, excluded the proffered evidence on the subject of an understanding with Ms. McClaron, a decision the Johnsons contend was error and which error had cascading effects. The Johnsons also contend the erroneous exclusion of this evidence prevented them from proving the fairness of the transactions at issue and that Ms. McClaron benefitted from the transactions. Accordingly, we shall first examine the trial court's decision to exclude this evidence.

## I. THE DEAD MAN'S STATUTE

Tennessee Code Annotated section 24-1-203, commonly known as the Dead Man's Statute,[12] provides:

> In actions or proceedings by or against executors, administrators, or guardians, in which judgments may be rendered for or against them, neither party shall be allowed to testify against the other as to any transaction with or statement by the testator, intestate, or ward, unless called to testify thereto by the opposite party. If a corporation is a party, this disqualification shall extend to its officers of every grade and its directors.

The purpose of the Dead Man's Statute is to protect estates from spurious claims and prevent interested parties from giving self-serving testimony regarding conversations or transactions with the deceased when the testimony involves transactions or statements that would either increase or decrease the deceased's estate.[13] *In re Est. of Marks*, 187 S.W.3d 21, 28 n.2 (Tenn. Ct. App. 2005). The statute is designed "to prevent the surviving party

---

[12] The Dead Man's Statute provides an exception to the presumption of competence that exists under Tenn. R. Evid. 601, which states that "[e]very person is presumed competent to be a witness except as otherwise provided in these rules or by statute." As an exception to the general rule, the Dead Man's Statute must be strictly construed against the exclusion of testimony and in favor of its admission. *Haynes v. Cumberland Builders, Inc.*, 546 S.W.2d 228, 230–31 (Tenn. Ct. App. 1976).

[13] If the Dead Man's Statute applies, "***neither party*** shall be allowed to testify against the other as to any transaction with or statement by the testator, intestate, or ward, **unless** called to testify thereto by the opposite party." Tenn. Code Ann. § 24-1-203 (emphasis added).

from having the benefit of his own testimony, when, by the death of his adversary, his representative was deprived of his executor's version of the transaction or statement." *McDonald v. Allen*, 67 Tenn. 446, 448 (1874). Nevertheless, as discussed in *Holliman v. McGrew*, "[a] witness does not become wholly incompetent to testify when the statute applies, but the statute does limit the subjects a witness can address." 343 S.W.3d 68, 73 (Tenn. Ct. App. 2009).

Here, the action was commenced by an administrator, and the proffered testimony relates to transactions or statements which would either increase or decrease the estate in issue. As a consequence, the Johnsons, who are interested parties to this action, are precluded from giving self-serving testimony regarding conversations or transactions with Ms. McClaron that would decrease her estate. *See In re Est. of Marks*, 187 S.W.3d at 28 n.2. More specifically, the Dead Man's Statute precludes the Johnsons from testifying "as to any transaction with or statement by" Ms. McClaron. This includes the subject of the alleged understanding between the Johnsons and Ms. McClaron wherein Ms. McClaron agreed that the Johnsons would receive her assets at her death in consideration for the services the Johnsons agreed to provide throughout the latter years of her life.[14]

Therefore, we affirm the trial court's decision to exclude the Johnsons' testimony on the subject of an alleged "understanding" or "agreement" pursuant to which they would provide personal care and assistance to and for Ms. McClaron in consideration for receiving the assets she owned at the time of her death.[15]

## II.  PARTIAL SUMMARY JUDGMENT—BREACH OF FIDUCIARY DUTIES

The execution and exercise of a power of attorney establishes a fiduciary relationship between the attorney-in-fact and the grantor of the power. *Childress*, 74 S.W.3d at 328–29. On October 5, 2010, Ms. McClaron executed the durable general Power of Attorney that appointed the Johnsons as her attorneys-in-fact. The Johnsons' first exercised their powers of attorney on November 10, 2010, when Rita Johnson set up accounts for Ms. McClaron at First Federal Savings Bank. Thus, the fiduciary relationship between the Johnsons and Ms. McClaron was established on November 10, 2010. *See id*.

---

[14] The Johnsons identified their services as including "taking care of their physical needs, household needs, care of their properties, shopping, taking them to doctors, dentists, hairdressers and other appointments, taking them to church, and making sure they were eating, bathing, and dressing."

[15] The foregoing notwithstanding, it is important to note that the Dead Man's Statute does not exclude the Johnsons' testimony on *subjects* that may not increase or decrease the deceased's estate. *See Cantrell v. Est. of Cantrell*, 19 S.W.3d 842, 846 (Tenn. Ct. App. 1999); *see also Holliman*, 343 S.W.3d at 73 ("A witness does not become wholly incompetent to testify when the statute applies, but the statute does limit *the subjects* a witness can address.") (emphasis added).

It is undisputed that the Johnsons were Ms. McClaron's attorneys-in-fact at all times material to this action and that every transaction at issue was accomplished by Rita Johnson's use and/or William Johnson's use of the powers of attorney conveyed to each of them by Ms. McClaron.[16] Therefore, we begin our analysis by focusing on the fiduciary responsibilities of attorneys-in-fact.

Agents (attorneys-in-fact) acting pursuant to a power of attorney have a fiduciary relationship with the principal. *Rose*, 239 S.W.3d at 749 n.3. "[A] fiduciary is obligated to deal with the property of his principal in the 'utmost good faith.'" *Ralston*, 306 S.W.3d at 221 (quoting *Martin v. Moore*, 109 S.W.3d 305, 309 (Tenn. Ct. App. 2003)). "The duties of loyalty and honesty are also a part of a fiduciary's obligation." *Id.* Stated another way, "[a] fiduciary duty is the duty to act primarily for another's benefit." *McRedmond*, 46 S.W.3d at 738. Therefore, the Johnsons were under a fiduciary duty to take all actions on Ms. McClaron's behalf in the "utmost good faith, loyalty, and honesty," *Ralston*, 306 S.W.3d at 227, and to act primarily for the benefit of Ms. McClaron, *McRedmond*, 46 S.W.3d at 738.

Notably, "[i]n a transaction involving a fiduciary relationship, *a presumption of invalidity attaches to the transaction once it is shown that the fiduciary benefitted from the transaction*." *In re Est. of Smith*, No. 02A01-9503-CH-00055, 1996 WL 363591, at *2 (Tenn. Ct. App. July 2, 1996) (emphasis added). As Judge Felts explained in *Roberts v. Chase*, 166 S.W.2d 641 (Tenn. Ct. App. 1942), the strength of the presumption of invalidity varies with the circumstances of each case; therefore, the strength of the rebutting evidence must vary proportionally:

> With great deference to [the Chancellor], we believe he failed to give due regard to the presumption of the invalidity of the deed which arose from the admitted fiduciary relationship. That equity raises such a presumption is established by all the authorities. The fiduciary relation may be of any kind which implies confidence, as trustee and beneficiary, attorney and client, parent and child, guardian and ward, physician and patient, nurse and invalid, confidential friend and adviser, indeed, any relation of confidence between persons which gives one dominion or influence over the other. Speaking of a transaction between parties to a fiduciary relation Mr. Pomeroy says: "*While equity does not deny the possibility of valid transactions between the two parties*, yet because every fiduciary relation implies a condition of superiority held by one of the parties over the other, *in every transaction between them by which the superior party obtains a possible benefit, equity raises a presumption against its validity, and casts upon that party the*

---

[16] A power of attorney is a written instrument that evidences to third parties the purpose of the agency and the extent of the agent's powers. *Tennessee Farmers Life Reassurance Co. v. Rose*, 239 S.W.3d 743, 749 (Tenn. 2007).

***burden of proving affirmatively its compliance with equitable requisites, and of thereby overcoming the presumption***."

The presumption of invalidity extends to all dealings between persons in fiduciary and confidential relations, and embraces gifts, contracts, sales, releases, mortgages and other transactions by which the dominant party obtains a benefit from the other party. The strength of the presumption varies according to the circumstances of each particular case. ***Where the fiduciary*** deals directly with his principal, the presumption of invalidity is rebuttable; but where he ***deals for his own account with his principal's property without the principal's knowledge, the presumption becomes conclusive***. In cases where the presumption is rebuttable it can be rebutted only [by] clear evidence of good faith, full knowledge and of independent action and consent; or by the "clearest and most satisfactory evidence to be adduced, that at the time the transaction took place, no advantage whatever was taken, either of the confidential relations existing in order to obtain a benefit, or of the weakness and frailty of the party from whom the benefit was received." ***If the transaction purported to be one for a consideration, the burden rests upon the fiduciary to show that the consideration was adequate***. The circumstances of some transactions are such that the only way in which the fiduciary can rebut the presumption of invalidity is by showing that his principal had the benefit of independent advice.

*Id*. at 650–51 (emphasis added) (citations omitted) (first quoting 3 John Norton Pomeroy & Spencer W. Symons, *Pomeroy's Equity Jur.* 790 (5th ed. 1941); then quoting *Graves v. White*, 63 Tenn. 38, 41–42 (1874)).

As explained above, the Johnsons were obligated by their fiduciary duty to act primarily for the benefit of Ms. McClaron with regard to each transaction they engaged in on her behalf. Yet, it remains undisputed that the Johnsons benefitted from the transactions at issue while there is no evidence of a benefit to Ms. McClaron. Because the Johnsons benefitted from the transactions at issue, a presumption of invalidity attached to the transactions. To rebut the presumption, the Johnsons were required to establish the fairness of the transaction. *See Childress*, 74 S.W.3d at 328.

"The factors which are important in determining whether a transaction is fair include: (1) whether the fiduciary made a full and frank disclosure of all relevant information within his possession; (2) whether the consideration was adequate; and (3) whether the principal had independent advice before completing the transaction." *Sec. Fed. Sav. & Loan Ass'n of Nashville v. Riviera, Ltd*., 856 S.W.2d 709, 714 (Tenn. Ct. App. 1992). Additionally, when analyzing the actions of a fiduciary engaging in transactions on behalf of the non-dominant party, ***the Tennessee Supreme Court has required proof that the transaction was necessary to protect the interest of the non-dominant party***. *See Folts*,

132 S.W.2d at 208; *Morris v. Morris*, 258 S.W.2d 732, 734 (Tenn. 1953).

The Johnsons presented no evidence regarding a full and frank disclosure of any of the transactions to establish there was consideration for any of the transactions at issue or that Ms. McClaron received independent advice regarding the transactions. In fact, there was no evidence Ms. McClaron was aware of the transactions at issue.[17]

Further, the only evidence the Johnsons proffered to show the necessity of the transactions was an alleged understanding or agreement with Ms. McClaron. Essentially, the Johnsons asserted that they agreed to provide personal care and assistance to Ms. McClaron, for the rest of her life, in consideration for receiving, at the time of Ms. McClaron's death, all the assets she owned. However, and as explained above, the trial court properly excluded the Johnson's proffered evidence on the subject of an alleged understanding or agreement with Ms. McClaron based on the Dead Man's Statute. Resultantly, the Johnsons presented very few facts for the court to consider in their response to the motion for partial summary judgment.

The Johnson proffered the declarations of Lillian Hatcher and Barbara Johnson, which were not excluded[18]; however, neither Ms. Hatcher's nor Barbara Johnson's testimony created a dispute of a material fact. Ms. Hatcher merely stated that she was aware that the Johnsons took care of Ms. McClaron and Frankie Harrington for many years toward the end of their respective lives. She also stated that she never knew "William Johnson or Rita Johnson to be other than good, honest, and helpful people" and did "not believe it would be in their character to have taken advantage of [Ms. McClaron] or her sister, Frankie Harrington."

Barbara Johnson's declaration stated, in part, that she lived with Ms. McClaron and Ms. Harrington from 2013 to 2016 and "helped them with their physical needs, especially cooking" and that "Louisianna McClaron still knew what she was doing mentally in 2010 through 2013, and she certainly knew what she was doing in October 2010." Barbara Johnson also stated that while she lived with the sisters, she fell and Ms. McClaron called 911 to have an ambulance come to the house. She also stated that Ms. McClaron "had physical limitations, but her mind was still sharp."

None of the testimony provided by Ms. Hatcher or Barbara Johnson pertains to a material fact at issue; therefore, their declarations fail to create a dispute of a material fact.

---

[17] With the possible exception of the deed that Ms. McClaron signed; albeit, whether Ms. McClaron was mentally competent to appreciate the significance of the deed she signed is not established by his record. Moreover, Ms. McClaron's mental competency is not relevant to the issues on appeal. As noted earlier, the trial court's decision was not based on Ms. McCaron's mental capacity.

[18] The Dead Man's Statute does not exclude competent testimony by non-parties. Thus, the statute does not exclude the declaration by Lillian Hatcher or Barbara Johnson. *See* Tenn. Code Ann. § 24-1-203.

Moreover, the bulk of the Johnsons' testimony was excluded, and the testimony of the Johnsons that was admissible failed to create a dispute of a fact that is material to the issues at hand. Accordingly, and contrary to the Johnsons' contentions, no material facts are in dispute.

Having considered the relevant and material facts, which are undisputed, we agree with the trial court's determination that the Johnsons presented no competent evidence to establish the necessity of the transactions at issue, that the transactions resulted in a benefit to Ms. McClaron, or that the transactions were fair to Ms. McClaron. To the contrary, the evidence in the record leads to but one conclusion, that the Johnsons were the only ones who benefitted from the transactions at issue.

Once the Johnsons' exercised their powers of attorney, a confidential, fiduciary relationship existed between the Johnsons and Ms. McClaron at all times material to this action. *See Childress*, 74 S.W.3d at 328–29. Based on the undisputed facts in the record and the legal principles set forth above, we have determined that the Johnsons had a fiduciary duty to deal with Ms. McClaron's property in the "utmost good faith," *see Ralston*, 306 S.W.3d at 227, and to act primarily for the benefit of Ms. McClaron, *see McRedmond*, 46 S.W.3d at 738, but they failed to do so. The undisputed facts establish that the Johnsons benefitted from each of the transactions at issue. In contrast, Ms. McClaron did not benefit from the transactions, and the transactions were not fair to Ms. McClaron. Moreover, and significantly, the undisputed facts establish that the transactions orchestrated by the Johnsons were not necessary to protect the interest of Ms. McClaron. *See Folts*, 132 S.W.2d at 208. Accordingly, the record fully supports the trial court's determination that the Johnsons breached their fiduciary duties to Ms. McClaron as well as the trial court's grant of partial summary judgment in favor of the Administrator on the issue of liability.

For the foregoing reasons, we affirm the trial court's decision to grant the Administrator's motion for partial summary judgment.

### III. THE FINAL JUDGMENT

Although the Johnsons challenged the trial court's decision to grant partial summary judgment on the issue of liability—the by-product of the Johnsons' numerous breaches of their fiduciary duties—the Johnsons did not challenge any of the trial court's rulings following that decision. Specifically, they have not challenged the trial court's decisions following the bench trial that pertain to the ownership of assets at issue.

To be clear, following its decision to grant the Administrator's motion for partial summary judgment, the trial court set the case for a bench trial to determine, *inter alia*: which assets belonging to Ms. McClaron were converted by defendants, the current state of those assets, and the relief that should be awarded to the Administrator. The court

determined that the deed purporting to convey a one-third interest of Ms. McClaron's home on Cheshire Road to the Johnsons as joint tenants in common with rights of survivorship was null and void. The trial court also found that the following assets remained the property of Ms. McClaron, and the court ordered the Johnsons to return and/or to facilitate the return to the Administrator of all the disputed assets, including any earnings or accruals thereon: (1) the First Advantage Bank checking account, totaling $356,019.32; (2) the First Advantage Bank savings account, totaling $103,042.75; (3) the Delaware Life annuity contract with a $173,270.17 value; (4) two New York Life annuity contracts, with a combined value of $88,482.93; (5) the Lincoln Financial annuity contract, with a $58,674.51 value; and (6) an SUV of an unknown model, year, and value.

Because we affirmed the decision to grant partial summary judgment and none of the decisions that followed the grant of summary judgment are at issue in this appeal, those rulings by the trial court are not disturbed by any ruling in this appeal.

## IN CONCLUSION

The judgment of the trial court is affirmed in all respects, and this matter is remanded with costs of appeal assessed against the Johnsons, jointly and severally.

_____
FRANK G. CLEMENT JR., P.J., M.S.